[L.A. No. 31114. Apr. 17, 1980.]

INTERNATIONAL BUSINESS MACHINES, Plaintiff
and Respondent, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

924

COUNSEL

Evelle J. Younger and George Deukmejian, Attorneys General, Ernest P. Goodman, Assistant Attorney General, Philip M. Plant and Philip C. Griffin, Deputy Attorneys General, for Defendant and Appellant.

O'Melveny & Myers, Bennett W. Priest, Donald R. Spuehler, Frederick A. Richman and Dean M. Weiner for Plaintiff and Respondent.

OPINION

**TOBRINER, J.**—Defendant State Board of Equalization (hereafter Board) appeals from a judgment awarding plaintiff International Business Machines (hereafter IBM) a sales tax refund of $735,196.27 for taxes paid by IBM during 1965-1967.[1] The Board contends that the trial court erred in concluding that certain lease receipts were exempt from taxation under a "grandfather clause" contained in Assembly Bill No. 1 of the 1965 First Extraordinary Session, hereafter referred to as the 1965 Tax Lease Law.

As we shall explain, we concur in the Board's position, concluding that in light of the statutory language, the legislative history, and the applicable principles of statutory construction, the Board's administrative construction of the 1965 Tax Lease Law was both reasonable and persuasive. Thus, we hold, the lease antedating the 1965 law could attain tax exemption only if the parties had been unconditionally bound

---

[1]The claim in the instant case is for a refund of over $900,000. IBM has stipulated that the total amount of claims dependent on the result in this case which it holds on its own behalf or on behalf of its customers exceeds $21 million. Defendant Board of Equalization has indicated that claims held by other taxpayers which are also dependent on the outcome of this case amount to an additional $25 million. Thus, if the IBM position prevails, the State of California will be obligated to refund a total of $46 million.

Part of this refund would not be retained by IBM but would be returned to the IBM customers who actually paid the sales tax. (See Rev. & Tax. Code, § 6054.5.) (All references in this opinion to code sections are to the Revenue and Taxation Code.)

to continue the lease at a rental that had been fixed prior to the effective date of the law. Because under this construction IBM's leases fail to win exemption, the judgment should be reversed.

1. *Statement of facts and proceedings below.*

Before 1965, receipts from a lease of personal property were not necessarily subject either to sales or use tax. The statutes gave a lessor the option of either paying a sales or use tax based upon his cost of acquisition or measuring his tax liability by rental receipts. This same option embraced lessors, such as IBM, who manufactured the equipment that they leased. Such a lessor normally elected to pay sales or use tax on the cost of parts and materials purchased for use in manufacturing the leased property. Since that cost did not include allowances for labor, overhead, and profit, which would nevertheless be reflected in the subsequent rental price, manufacturer-lessors such as IBM enjoyed a tax advantage under the pre-1965 scheme. Such manufacturer-lessors avoided all sales and use taxes except a sales tax on the raw materials used in the manufacturing process.

In 1965, the California Legislature took notice of this inequity in the taxing system and amended the Sales and Use Tax Law to provide for the direct taxation of leases. The new law generally imposed a *use* tax on the lessee, the tax being measured by the lessee's rental payments that were collected by the lessor. But because some business institutions in California, most notably banks and insurance companies enjoyed exemption from paying any use tax, the new law provided that in such cases the lessor would be liable for a sales tax based on payments received from the lessee.[2]

The present case concerns the application of two provisions of the 1965 Tax Lease Law, section 6006.3, subdivision (b), and section 6391, to receipts derived from IBM's leases of personal property. Section 6006.3, subdivision (b), defined a taxable lease, for purpose of sales and use tax, to include "only an original lease or a renewal of an original lease entered into or executed after the operative date of this section [August 1, 1965]." Section 6391 granted a sales tax exemption for "the

---

[2]Generally, a sales tax is imposed upon retailers for the privilege of selling tangible personal property (§ 6051), while a use tax is an excise tax imposed on the consumption of tangible personal property in the state which has been purchased from any retailer (§ 6201).

rentals payable under a lease of tangible personal property for any period of time for which the lessor is unconditionally obligated to lease the property for an amount fixed by the lease prior to the operative date of this section...." Thus both provisions constituted "grandfather clauses" exempting certain antecedent leases from sales tax.

Section 6006.3, subdivision (b), was shortlived; the 1967 Legislature repealed that section and replaced it with section 6407. Section 6407 adopted the unconditional obligation language of section 6391, which had provided a sales tax exemption for leases which obligated the lessor to a lease for a rental fixed prior to August 1, 1965, to define a parallel exemption from use tax.[3] The parties agree that since section 6407 became effective on November 8, 1967, IBM leases are exempt from tax only if they were executed before August 1, 1965, and impose an unconditional rental obligation.

IBM now seeks a refund for sales tax paid between November 1, 1965, and March 31, 1967, on receipts derived from lease agreements between IBM and various banks and insurance companies constitutionally exempt from use tax liability. The leases in question were executed prior to August 1, 1965, but subject to cancellation or modification by either party. The standard lease form employed provided that the parties' original agreement would remain in effect for one year following the date of the installation of the first equipment. Thereafter, the agreement could be modified or terminated upon three months written notice. The lessee could request machines in addition to, or to replace, the original machines; IBM could change the monthly rental charge for any or all of its equipment. Models were updated as necessary, and the later models, having different capabilities, commanded higher lease rentals than older models.

The record does not detail the history of the individual leases. From the tenor of the controversy below and in this court, we can assume that most of the IBM leases in question were executed more than one year prior to August 1, 1965, and thus as of that date were subject to modification or termination on three months' notice. We further assume that notwithstanding the power of termination, the leases remained in effect

---

[3]Section 6407 exempts a lease from a use tax only "for any period of time for which the lessee is obligated to lease the property for an amount fixed by the lease prior to August 1, 1965. The lessee shall be deemed not to be obligated for any period of time for which he has the unconditional right to terminate the lease upon notice, whether or not the right is exercised."

during the period from November 1, 1965, through March 31, 1967, but that many of the leases were modified during that period; the modifications involved increases in rentals, delivery of new equipment, replacement or modification of old equipment, and other matters.

IBM also sought refunds for sales taxes paid on three categories of equipment orders. "Category 1" orders were those in which the lease was executed before August 1, 1965, but the equipment installed after that date. "Category 2" referred to orders subsequent to August 1, 1965, by existing customers pursuant to provisions of leases executed before the statutory date. "Category 3" referred to conditional orders placed before August 1, 1965, but in which the lease was actually executed and the equipment delivered after that date.

IBM filed suit for refund in the superior court pursuant to section 6933. It claimed that the "renewal" subsequent to August 1, 1965, of an antecedent lease did not render the lease receipts taxable. Alternatively, it contended that even if the "renewal" of an antecedent lease renders such receipts taxable, neither the parties' failure to exercise the power to terminate under the IBM standard lease, nor such modifications as resulted from changes in equipment or rental rates, constituted a taxable "renewal" of the lease. Finally, it claimed the orders in categories 1-3 were exempt from tax. The matter was submitted to the trial court on stipulated facts,[4] which found in favor of IBM on all principal issues[5] and entered judgment ordering a refund of $735,106.27. The Board appeals from that judgment.

2. ▮▮▮ *Receipts from leases renewed after August 1, 1965, are not exempt from sales tax.*

Both section 6391 and section 6006.3, subdivision (b), defined an exemption from the sales tax. The Board maintains that under section 6391 the renewal after August 1, 1965, of a prior lease clearly renders the receipts taxable. Section 6391 exempted only leases "for which the

---

[4]The trial court initially admitted the testimony of Charles Otterman, tax counsel for the Board, who attended the 1965 conference committee meeting at which the legislators gave instructions concerning the drafting of section 6006.3, subdivision (b). The court later granted a motion to strike, and decided the case on the stipulated facts.

[5]The trial court found that orders placed after August 1, 1965, pursuant to antecedent leases (category 2 orders) were taxable to the extent that they resulted in an increase in rental, and that conditional orders in which the lease was executed after August 1, 1965 (category 3 orders) were taxable in full.

lessor is unconditionally obligated to lease the property for an amount fixed by the lease prior to August 1, 1965"; presumably upon the renewal of a lease the parties could renegotiate the rent, and could no longer be said to be unconditionally obligated to lease for an amount fixed at an earlier date. IBM does not dispute this interpretation of section 6391.

IBM maintains, however, that section 6006.3, subdivision (b), enacted a broader exemption that section 6391, and that this broader exemption controls the instant case. The Board, in response, contends that the two statutes should be construed together, with the exemption of section 6006.3, subdivision (b), read narrowly to avoid inconsistency with the provisions of section 6391. We turn therefore to the construction of section 6006.3, subdivision (b), to determine whether that section stands in irreconcilable conflict with section 6391.

Section 6006.3, subdivision (b), defined a taxable lease as "an original lease or a renewal of an original lease entered into or executed after [August 1, 1965]." The Board construes this language to permit taxation of (a) a lease executed after August 1, 1965, and (b) the renewal after that date of a lease executed *before* August 1, 1965. IBM argues that the statute permits taxation only of (a) a lease executed after August 1, 1965, and (b) the renewal of such a lease, i.e., a lease executed *after* August 1, 1965.

The Board has embodied its interpretation of section 6006.3, in an administrative regulation.[6] ■ ■■■■ That regulation, a contemporary administrative construction of a statute by the agency charged

---

[6]Regulation 2070, promulgated August 2, 1965, provides in pertinent part:

"(C) *Leases On and After August 1, 1965.* (1) For the purposes of this ruling, 'lease' includes only an original lease entered into or executed on or after August 1, 1965, or a renewal of an original lease *when the renewal is entered into or executed* on or after August 1, 1965.

"⋯

"(2) Tax does *not* apply to leases of:

"(E) Any tangible personal property rented under an *original lease* entered into or *executed prior to* August 1, 1965, *or a renewal thereof entered into or executed prior to August 1, 1965.*

"In all the foregoing cases, the lessor is the consumer of the property.

"(3) Application of Tax to Leases:

"⋯

"(B) When rentals with respect to any lease of tangible personal property situated in this state are *not subject to use tax* because of the exempt status of the lessee (for example, banks, insurance companies, the United States and its instrumentalities), the retailer is liable for *sales tax* measured by such rentals." (Italics added.)

with its enforcement and interpretation, "is entitled to great weight unless it is clearly erroneous or unauthorized." (*Rivera v. City of Fresno* (1971) 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]; *Wilkinson v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848].)[7]

 The language of section 6006.3, subdivision (b), and the legislative purpose expressed in that language, support the Board's regulation. As we have stated, the section defined a taxable lease as being limited to "an original lease or a renewal of an original lease entered into or executed after [August 1, 1965]. . . ." IBM contends that a lease which was renewed after August 1, 1965, is exempt from taxation as long as the original lease *itself* was entered into prior to August 1.

We believe that IBM's assertion is not supported by the common sense inference to be drawn from section 6006.3, subdivision (b). The legislative intent in passing the statute obviously rested on a recognition that a renewal of a lease is essentially the same as a new lease and accordingly must be treated as such for the purposes of applying the statute. The Legislature in enacting section 6006.3, subdivision (b), sought to exempt from taxation only those leases which were already in force at the time the statute went into effect because the contract price (i.e., lease payments) was calculated without the knowledge that an additional tax was to be imposed. It is difficult to conceive of, and IBM does not assert, any persuasive reason why the Legislature would want to exempt leases which were renewed *after* the effective date of the statute, and which thus were subject to a renegotiation of prices to take into account the added tax.

Further, since the parties agree that *leases* executed after the statutory date are subject to taxation, *renewals* of such leases would necessarily be subject to taxation. Thus under IBM's proposed interpretation, the renewal language of section 6006.3, subdivision (b), becomes

---

[7]In the review of quasi-legislative actions of administrative agencies, judicial review is limited to a determination whether the agency's action is arbitrary, capricious, lacking in evidentiary support, or contrary to procedures provided by law. (See *Pitts v. Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]; *Davies v. Contractors' State License Bd.* (1978) 79 Cal.App.3d 940, 946 [145 Cal.Rptr. 284].) That standard of review, however, is inapplicable when the agency is not exercising a discretionary rule-making power, but merely construing a controlling statute. The appropriate mode of review in such a case is one in which the judiciary, although taking ultimate responsibility for the construction of the statute, accords great weight and respect to the administrative construction. (See, e.g., Davis, Administrative Law Treatise (2d ed., 1980 pocket supp.) § 29.01-1.

redundant; it applies to render taxable only renewals of leases executed after the statutory date, *which would be taxable in any event.* The Board's interpretation, on the other hand, gives independent vitality to the renewal clause, employing it to render taxable those leases which would otherwise escape taxation.

The legislative history of section 6006.3, subdivision (b), also supports the Board's interpretation. Section 6006.3, subdivision (b), and section 6391 were enacted simultaneously as part of the same bill, Assembly Bill No. 1 of the 1965 First Extraordinary Session. Section 6391 clearly permits taxation of renewals of antecedent leases; if section 6006.3, subdivision (b), were construed to exempt such leases from taxation, the two provisions would conflict. ██ It is, however, "an established rule of statutory construction that similar statutes should be construed in light of one another . . . .'[A]pplication of the rule that statutes in pari materia should be construed together is most justified, and light from that source has the greatest probative force, in the case of statutes relating to the same subject matter that were passed at the same session of the legislature, especially if they were passed or approved or take effect on the same day . . . .'" (*People* v. *Caudillo* (1978) 21 Cal.3d 562, 585 [146 Cal.Rptr. 859, 580 P.2d 274].) When as in the present case both statutes are part of the same bill, enacted and chaptered together, the rule requiring the courts to reconcile the statutes is even more compelling, for neither can be viewed as an implied repeal of the other. (Cf. *In re Thierry S.* (1977) 19 Cal.3d 727, 738-739 [139 Cal.Rptr. 708, 566 P.2d 610].)[8]

██ IBM contends, however, that the legislative history of the 1965 Tax Lease Law supports its interpretation. It points out that Assembly Bill No. 1 originally included section 6391 but did not include section 6006.3, subdivision (b). The bill in that form passed the Senate but was defeated in the Assembly. The Conference Committee added section 6006.3, subdivision (b), after which both chambers approved the revised bill.

---

[8]The Board further relies on the testimony of Charles Otterman, tax counsel for the Board, who attended the conference committee. He testified in essence that the committee instructed the drafters to draft a use tax exemption parallel to section 6391's sales tax exemption. After hearing his testimony, the trial court granted a motion to strike.

Proffered proof of legislative intent by testimony of persons present at unreported legislative deliberations is at best doubtful. We resolve the issues in this case without reliance upon Otterman's testimony, and without resolving the question of its admissibility.

From this chronology, IBM urges the conclusion that section 6006.3, subdivision (b), was intended to broaden the tax exemption beyond that granted by section 6391. According to IBM, after the addition of section 6006.3, subdivision (b), the sales tax exemption of section 6391 was superfluous, but was "inexplicably left in the bill." "The only explanation for Section 6391's retention," it asserts, "is legislative inadvertence caused by the rushed drafting schedule."[9]

According to IBM, we should disregard section 6391 completely, as if it had never been enacted. We believe, instead, that we must view it as a valid statute, having been duly passed by the Legislature and signed by the Governor, and that it thus serves as a significant aid to the interpretation of section 6006.3, subdivision (b). Indeed, unlike section 6006.3, subdivision (b), which was repealed in 1967, section 6391 remains a part of California law today, and since 1967 has been the only statute defining the scope of the exemption of antecedent leases from sales taxation.[10]

The statute's subsequent history even more strongly indicates that the Legislature intended to subject renewal of pre-1965 leases to the new tax. When the 1967 Legislature amended the 1965 Tax Lease Law, by deleting section 6006.3, subdivision (b), and adding section 6407, a use tax exemption which tracked the language of the sales tax exemption provided in section 6391, it exempted only lessors unconditionally obligated to lease property at rentals fixed prior to August 1, 1965, the operative date of the 1965 Tax Lease Law.

---

[9]IBM further relies on a letter from the Legislative Counsel to Senator McAteer, written the day following enactment of the 1965 Tax Lease Law, stating that "The tax on leases would apply only to leases executed on and after August 1, 1965." This statement, which omits mention of the renewal language of section 6006.3, subdivision (b), and of section 6391 in its entirety, cannot be taken as a complete summary of the impact of the legislation.

[10]IBM also contends that the purpose of section 6006.3, subdivision (b), and section 6391 was to avoid "double taxation," that is, taxation of the receipts from leases on which IBM had already paid a sales tax on the cost to it of the raw materials incorporated in the leased product. We doubt that this contention correctly appraises the legislative purpose. The statute grants a complete exemption to receipts from some leases executed before August 1, 1965, even though the tax from such receipts would far exceed the sales tax paid on the raw materials; it grants no exemption for subsequent leases even though the raw materials may have been purchased and taxed before August 1, 1965. The date of execution of the lease and the unconditional nature of its terms, not the amount of tax, if any, paid on the raw materials, is the crux of the statutory exemption. We therefore conclude that the Board's theory—that the exemption was intended to protect parties locked into leases at rentals which took no account of the new tax—is the more plausible view of legislative intent.

The fact that the 1967 amendment by its terms applies to leases executed or renewed after the effective date of the *1965* legislation indicates that it was enacted to clarify the earlier legislation.[11] If the 1967 Legislature had intended a substantive change, instead of a clarification, a change which would impose a tax upon lease receipts hitherto exempt from tax, undoubtedly it would have applied that provision only to leases executed or renewed after the effective date of the 1967 legislation. To apply a substantively more restrictive 1967 law to leases executed or renewed during the 1965-1967 period would unfairly tax transactions exempt from tax when consummated. When we perceive the 1967 amendment as a clarification of prior law, however, the problem of retroactive taxation disappears; the 1967 Legislature was not retroactively narrowing the tax exemption, but demonstrating that it had intended a narrow exemption when it enacted the Tax Lease Law in 1965.

Second, a long line of cases holds that when a tax statute is amended at a time when taxpayers are resisting taxation under the statute, the inference arises that the amendment was intended as a clarification rather than a substantive change of preexisting law. (*City of Los Angeles* v. *Rancho Homes, Inc.* (1953) 40 Cal.2d 764, 771 [256 P.2d 305]; *Bermite Powder Company* v. *Franchise Tax Bd.* (1952) 38 Cal.2d 700, 704 [242 P.2d 9]; *Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918, 923 [156 P.2d 1]; see *Standard Oil Co.* v. *Johnson* (1944) 24 Cal.2d 40, 48 [147 P.2d 577]; *Union League Club* v. *Johnson* (1941) 18 Cal.2d 275, 278-279 [115 P.2d 425].) Unquestionably, IBM and numerous other lessors and lessees vigorously resisted taxation under the 1965 Tax Lease Law, and throughout its existence vociferously disputed the Board's interpretation of section 6006.3, subdivision (b). We thus conclude that the Legislature enacted section 6407 to resolve this dispute by a clarification of its intent.

---

[11]Included in the 1967 draft bill was a section stating that the bill did not constitute a change in the existing sales and use tax law, but was merely a clarification of legislative intent. As introduced and passed, however, the bill omitted this statement. IBM argues that the Legislative Counsel's deletion of the statement of clarification compels the conclusion that the bill was in fact intended as a change in existing law. We believe that the deletion of the statement is of little significance: it occurred not because the Legislature rejected a draft containing the statement, but only because the Legislative Counsel, for unknown reasons, omitted the statement when it prepared the bill for introduction to the Legislature. In view of the well-settled rule that when a tax statute is amended at a time when taxpayers are resisting taxation, the change is presumed to be intended as a clarification rather than a change in preexisting law (see this page, above), the Legislative Counsel may well have considered the statement simply superfluous.

In summary, the Board's interpretation of section 6006.3, subdivision (b), embodied in its regulation 2070, finds support in the statutory language, the purpose of the Legislature, and the legislative history of section 6006.3 and of related enactments. We therefore adopt the Board's conclusion that the renewal, after August 1, 1965, of leases executed before that date, subjects those leases to sales tax. This conclusion brings section 6006.3, subdivision (b), into conformity with section 6391, and renders it unnecessary to discuss which statute would prevail in event of conflict.

3. *The extension of the IBM leases by failure to exercise a power of termination renders those leases subject to sales tax.*

Recognizing that a post-August 1, 1965, renewal is taxable under the statute, we face the remaining issue whether the IBM-style lease agreement is more properly treated as a continuation of the original lease or as a perpetual renewal scheme. IBM and its lessees did not formally renew the leases here in question; IBM contends that this failure to act did not constitute a renewal of the leases and that therefore they were not subject to the new tax. The resolution of this issue depends on an understanding of the economic realities involved in an IBM lease agreement.

We have previously pointed out that IBM did not enter into separate formal lease agreements for every piece of equipment leased. Rather, IBM and the lessee signed a basic agreement which outlined some general conditions and specified the initial package of machines which IBM would provide. This skeleton agreement remained in effect for one year. Thereafter, either party could terminate it at the end of any calendar month for any reason, provided the party gave 90 days previous notice. IBM could change prices by any amount for any of the machines upon such 90-day notice. The agreement also provided that machines could be removed, exchanged, modified or additions made to them. In essence, the entire substance of the original skeletal "package" could change—price, quantity, type—and yet the original "lease agreement" would remain in effect.

The Board asserts that any payments received by IBM more than one year after the date of the original agreement were obtained pursuant to a renewal and are thus taxable if the renewal was executed after August 1, 1965. To prove its point, the Board suggests this hypothesis.

Assume an agreement is two years old so that both parties possess the unconditional right to terminate with 90 days' notice. The failure of either party to exercise that right by August 31, 1965, had the effect of binding them for the period of November 1 through November 30. The Board thus concludes that this failure to act *renewed* the lease for an additional 30 days.

IBM argues that an active renewal should be distinguished from a renewal which is accomplished by a mere failure to act. It points out that the term "renewal" has a narrow and technical meaning in the law of the leasing of real property. "A 'renewal' creates a new and distinct tenancy . . ., whereas an 'extension' is in effect the 'stretching or spreading out' of a former term . . . ." (*Burroughs* v. *Ben's Auto Park, Inc.* (1945) 27 Cal.2d 449, 454 [164 P.2d 897].) Thus, according to IBM, "[a] renewal contemplates the giving of a new lease and contemplates the execution of a new instrument by the lessor." (*Smith* v. *Arthur D. Little, Inc.* (1969) 276 Cal.App.2d 391, 401 [81 Cal.Rptr. 140].)

But IBM, we believe, draws a distinction without a difference. When two parties *voluntarily* place themselves in a position in which an omission rather than an act binds them to a contract, judicial emphasis on a distinction between act and omission would create an exaltation of form over substance as well as a manifestation of ignorance of economic reality. As the cases note, the terms "renewal" and "extension" are often used interchangeably (see *Smith* v. *Arthur D. Little, Inc., supra*, 276 Cal.App.2d 391, 398-399); we think the Legislature intended such usage here, using the word "renewal" as a synonym for "extension."

Use of the narrow and technical definition of "renewal" proposed by IBM in the present context would not only throw section 6006.3, subdivision (b), into direct conflict with section 6391, but would also promulgate meaningless distinctions. Taxability of the lease should not depend on the form by which the parties extend or modify their obligations. It should turn on the equities of the matter—whether the parties' freedom of action is constrained by lease provisions executed without regard to the impact of the tax. To prevent such inequities must surely be the objective of the grandfather clause of sections 6006.3, subdivision (b), and 6391—not to provide a permanent tax exemption for leases which the parties can extend and modify indefinitely without ever actually executing a formal "renewal" of the lease. A lease that can be stretched like rubber can hardly qualify for perpetual preservation in the stone of a tax exemption.

In summary, the Legislature enacted the 1965 Tax Lease Law to eliminate the tax advantage derived from leasing personal property instead of selling that property. If we are to preserve that purpose, we must narrowly construe the grandfather clause of section 6006.3, subdivision (b), to exempt from taxation only leases in which the parties *were bound* to a fixed rental negotiated before the new tax took effect. That constricted interpretation of section 6006.3, subdivision (b), moreover, brings that section into accord with the unequivocal provisions of section 6391 of the 1965 act and section 6407 of the 1967 act. We conclude that the Board correctly construed the Tax Lease Law to permit sales taxation of receipts derived from leases executed before August 1, 1965, if those leases were extended or modified, either through action or inaction, subsequent to that date.

The judgment is reversed, and the cause remanded for further proceedings consistent with the views expressed herein.[12]

Bird, C. J., Mosk, J., Clark, J., Richardson, J., Newman, J., and Blease, J.,* concurred.

Respondent's petition for a rehearing was denied May 14, 1980. Manuel, J., did not participate therein.

---

[12]As we noted, the trial court also considered the taxability of lease receipts falling into three special categories.

Category 1 included leases executed before August 1, 1965, pursuant to which the lessee ordered equipment before that date which was not actually delivered or installed until after that date. The trial court found such leases were not taxable. We agree that the delivery and installation of equipment after the statutory date would not in itself render the lease taxable, so long as that event did not alter a rental price unconditionally fixed prior to August 1, 1965.

Category 2 included antecedent leases with miscellaneous equipment changes requested and completed after August 1, 1965. The trial court concluded that the only amount taxable was the additional rental charge attributable to the equipment change. We agree that if the base rental price was unconditionally fixed prior to August 1, 1965, only the additional rental attributable to the equipment change is taxable.

Category 3 included leases derived from conditional orders for equipment placed before August 1, 1965, but which leases were not executed until after that date. The trial court found these leases taxable. Since IBM did not appeal from the judgment below, the taxability of these leases is not at issue here.

*Assigned by the Chairperson of the Judicial Council.