[No. A042074. First Dist., Div. Four. July 26, 1989.]

CITY OF GILROY, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent;
SCIENTIFIC GAMES, INC., et al., Real Parties in Interest and
Appellants.

COUNSEL

Allan J. Pinner, Russell J. Hanlon, Jeanette R. Youngblood and Berliner, Cohen & Biagini for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Timothy G. Laddish and Julian O. Standen, Deputy Attorneys General, Nielson, Merksamer, Hodgson, Parrinello & Mueller, James R. Parrinello and Marguerite Mary Leoni for Defendant and Respondent and Real Parties in Interest and Appellants.

OPINION

ANDERSON, P. J.—  In this opinion we resolve that the manufacturer's sale of printed tickets to the California Lottery Commission (Lottery Commission) is not exempt from state or local taxation pursuant to

Government Code section 8880.68.[1] Accordingly, the City of Gilroy (Gilroy) is entitled to a writ of mandate compelling the State Board of Equalization (Board) to decide whether, consistent with this opinion and the resolution of certain additional defenses to taxability within the city's borders pending before the Board, to tax the manufacturer's gross receipts from the sale of printed matter to the Lottery Commission. ■ We also hold that Gilroy lacks standing to overturn the Board's final decision on the manufacturer's successful claim for refund of some $3,729,054 in sales taxes levied on those sales.

## I. BACKGROUND

### A. *California State Lottery Act of 1984*

At the November 1984 general election, California voters approved Proposition 37, an initiative measure known as the California State Lottery Act of 1984. Proposition 37 amended the California Constitution to authorize establishment of a state lottery (Cal. Const., art. IV, § 19, subd. (d)), and added provisions to the Government Code[2] which created and empowered the Lottery Commission to operate the lottery.[3]

In approving the measure, the people declared that the purpose of the Act is to provide "additional monies to benefit education without the imposition of additional or increased taxes." (§ 8880.1.) Consistent with this purpose, the people expressed the intent that net revenues from the lottery "shall supplement the total amount of money allocated for public education in California." (*Ibid.*)

Total annual revenues from the sale of lottery tickets or shares are to be allocated as follows: (1) 50 percent to the public as prizes; (2) at least 34 percent to school districts and other public education agencies for education of students; and (3) no more than 16 percent for administrative expenses. (§ 8880.4.)

The Act authorizes the Lottery Commission to specify and establish the various lottery games (§§ 8880.28, 8880.12); specify the number and value of prizes (§ 8880.29); set the retail price for tickets (§ 8880.31); establish

---

[1] Government Code section 8880.68 reads: "No State or local taxes shall be imposed upon the sale of lottery tickets or shares of the California State Lottery or any prize awarded by the California State Lottery."

[2] All further statutory references are to the Government Code unless otherwise specified.

[3] Specifically, Proposition 37 added chapter 12.5 of division 1 of title 2. (§ 8880 et seq.) This chapter is known as the California State Lottery Act of 1984, hereafter referred to as the Act. (§ 8880.)

methods for distributing tickets (§ 8880.33); contract with retailers to sell game tickets to the public (§ 8880.13); and specify methods for determining winners (§ 8880.30) and verifying the validity of prizes (§ 8880.32). The Act also details procedures for contracting for procurement of goods and services necessary to run the lottery (§§ 8880.56 - 8880.60) and sets forth allowable costs (including costs of tickets) which comprise the 16 percent capped expenses of the lottery (§ 8880.64).

### B.  *Bradley-Burns Law*

Under authority of the Bradley-Burns Uniform Local Sales and Use Tax Law,[4] the Gilroy City Council has enacted an ordinance which imposes on retailers a 1 percent sales tax on the gross receipts from all retail sales of tangible personal property within the city. The Board administers the ordinance pursuant to the Bradley-Burns Law and a written agreement (the Agreement) with Gilroy to "perform exclusively all functions incident to the administration and operation of the . . . ordinance." The Board carries out this mandate by collecting the 1 percent sales tax and transmitting the revenues to the city.

### C.  *Scientific Games Contract*

In June 1985, the Lottery Commission entered into a contract with Scientific Games, Inc. (Scientific Games)[5] for the printing of instant game tickets. An instant ticket allows the purchaser to determine immediately whether he or she has won by scratching off the coating.

The record is unclear whether tickets for the first eight games were printed in California, but at some point Scientific Games opened a plant in Gilroy to manufacture the tickets. Scientific Games was the sole printer for the initial instant ticket games. Presently the Lottery Commission contracts with another vendor as well.

The first contract between Scientific Games and the Lottery Commission was silent on the issue of sales tax and the commission paid no sales tax under that contract. Thereafter, upon inquiry of the contracting parties, the audit staff of the Board advised them that the sales transactions were subject to tax and requested Scientific Games to set up a sales and use tax account. All subsequent printing contracts between Scientific Games and the Lottery Commission have included sales tax as part of the price of the

---

[4] Revenue and Taxation Code section 7200 et seq., hereafter the Bradley-Burns Law.

[5] Real parties in interest herein are Scientific Games, Inc., and Scientific Games of California, Inc. The record does not disclose the exact nature of the relationship between the two entities. We refer to both entities collectively as Scientific Games.

tickets, with a proviso that Scientific Games will rebate the tax in the event the Board rules that the transaction is exempt.

Scientific Games paid the assessments and filed refund claims for $3,729,054 in taxes paid through January 1987.[6] The Lottery Commission filed a brief supporting the refund claim, and the matter went to a preliminary hearing before a Board-appointed hearing officer. The hearing officer concluded that the section 8880.68 exemption did not apply and recommended that the Board deny the refund claim. Scientific Games petitioned for redetermination before the full Board, which unanimously voted to grant the refund on March 19, 1987. The Legislative Counsel of California later issued a legal opinion to the effect that the Board's administrative construction of section 8880.68 was reasonable.

### D. *Gilroy's Lawsuit*

Six months later, the Board informed Gilroy of the refund decision and Gilroy's obligation to repay its share in the amount of $659,000, and that Gilroy would lose the tax base generated by Scientific Games. The Board and the city agreed on an installment repayment plan for Gilroy's portion of the refund.

Then on December 10, 1987, Gilroy initiated the present lawsuit seeking declaratory and injunctive relief as well as a peremptory writ of mandate directing the Board (1) to collect and transmit to Gilroy all sales tax revenues due on the sale of printed matter from Scientific Games to the Lottery Commission, and (2) to set aside the refund decision. The trial court denied Gilroy's motion for peremptory writ of mandate and its application for preliminary injunction. This appeal followed; Scientific Games cross-appealed "on a precautionary basis" to the extent the trial court ruling implied that Gilroy had standing to challenge, and was not collaterally estopped from challenging the Board's administrative decision regarding Scientific Games' refund claim. Finally, we granted a rehearing to respond to concerns raised by Scientific Games and the state agencies concerning the scope of the remedies on remand.

The trial court based its ruling solely on the finding that "sales of instant game lottery tickets to the California State Lottery Commission by [Scientific Games] have been and continue to be exempt from sales and use taxes

---

[6] In addition to asserting that the transaction was exempt pursuant to section 8880.68, Scientific Games also argued it was an exempt sale for resale or, if deemed a taxable transaction, that the appropriate tax was a use tax upon the Commission. The parties agreed to reserve the sale for resale and use tax contentions for later briefing and argument before the Board, should the section 8880.68 issue be resolved in favor of taxation.

under section 8880.68 of the Government Code." We begin our review by resolving whether section 8880.68 applies to the transactions between Scientific Games and the Lottery Commission. We then settle the standing and issue preclusion matters raised by cross-appeal. Finally, we apply our determinations to the two matters before us, namely, the denials of Gilroy's motion for writ of mandate as well as its application for preliminary injunction.

## II.  SECTION 8880.68

All parties agree that section 8880.68 prohibits imposition of state or local tax on the sale of lottery tickets. The dispute concerns the meaning of the term "lottery tickets," nowhere defined in the Act.  ■  The precise issue facing this court is whether the term "lottery tickets" encompasses the printed tickets manufactured by Scientific Games and sold to the Lottery Commission or whether it more narrowly refers only to the public sale of an indicia of the right to participate in a lottery game.

The Board has interpreted section 8880.68 broadly to apply to the sales in question from Scientific Games to the Lottery Commission.  ■  Because the Board is charged with enforcing and interpreting our sales and use tax laws, its administrative construction of a statutory exemption to such laws will be " 'entitled to great weight unless it is clearly erroneous or unauthorized.' " (*International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923, 930-931 [163 Cal.Rptr. 782, 609 P.2d 1].) Thus, although we bear ultimate responsibility for construing the statute, we accord great respect to the Board's interpretation. (*Id.,* at p. 931, fn. 7.)[7]

The parties urge us to begin our task by applying the "plain meaning" rule.  ■  Our Supreme Court recently summarized this rule as follows: "Words used in a statute or constitutional provision should be given the meaning they bear in ordinary use. [Citations.] If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the . . . voters . . . ." (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Both sides also urge that if we read section 8880.68 in light of the Act's purpose and the entire statutory scheme as we must (*Ibid.*), their interpretation will prevail. Additionally, Scientific Games asserts that Gilroy's interpretation would reduce the provision to mere surplusage, a result our rules of interpretation seek always to avoid. (*Morro Hills Community Services Dist.* v. *Board of Supervisors* (1978) 78 Cal.App.3d 765, 773 [144 Cal.Rptr.

[7]The trial court, to which we owe no deference in this matter, considered its task an open-and-shut matter: "[T]he statute, on its face, means what it says. This is a lottery ticket, and lottery tickets are not simply printed matter. That's the reason for the ruling."

778].) ■ Finally, we are mindful that the canon of strict construction applies to interpretation of tax exemption statutes such as the one before us: " 'Statutes granting exemption from taxation must be reasonably, but nevertheless strictly, construed against the taxpayer. [Citations.] The taxpayer has the burden of showing that he *clearly* comes within the exemption. [Citations.] An exemption will not be inferred from doubtful statutory language.' " (*County of Sonoma* v. *State Bd. of Equalization* (1987) 195 Cal.App.3d 982, 990-991 [241 Cal.Rptr. 215], italics added.)[8]

We do not think the Board's construction comports with either the common understanding of the term "lottery ticket" or its meaning as construed by interpreting the Act as a whole. Nor has Scientific Games, as the retailer subject to imposition of sales tax, met its burden of showing it "clearly" falls within the exemption. Finally, we conclude our interpretation does not render section 8880.68 "mere surplusage."

## A. *Plain Meaning*

■ The ordinary meaning of the word "lottery" is: "a scheme for the distribution of prizes by lot or chance; *esp* : a scheme by which prizes are distributed to the winners among those persons who have paid for a chance to win them [usually] as determined by the numbers on tickets as drawn at random (as from a lottery wheel) . . . ." (Webster's New Internat. Dict. (3d ed. 1965) p. 1338.) ■ The ordinary sense of the term "ticket" in this context is: "a certificate, evidence, or token of a right (as of . . . a chance) . . . < a lottery _____ > . . . ." (*Id.,* at pp. 2389-2390.) ■ Thus, in the popular sense of the term, a person purchases a lottery ticket when he or she pays for the right to a chance to win a prize.

Scientific Games maintains it is irrational to assert that the Lottery Commission is buying printed matter and not lottery tickets because these state-of-the-art instant tickets are ready to play when they leave the press—their physical attributes do not change until the player scratches off the surface coating. This argument literally exalts form over substance by ignoring the key ingredient of a lottery ticket, i.e., it is the physical evidence of a *right* of the purchaser or holder to a chance to win. Implicit in this concept is that the right which the ticket evidences derives from the seller's authority to dispense the right. Certainly, Scientific Games has no authority to confer on anyone the right to participate in lottery games, and no one could argue

---

[8] It is not difficult to fathom the rationale for this rule of construction, given the potential fiscal impact of a sales tax exemption on the public purse. By definition, a sales tax exemption is "*any* provision which causes a reduction in revenue to a city or county under [the Bradley-Burns Law]." (Rev. & Tax. Code, § 2214, italics added.)

rationally that the Lottery Commission is paying for a chance to win a prize when it buys printed tickets from Scientific Games.

### B. *Purpose*

We are satisfied that the plain meaning of "lottery tickets" does not include the purchases here. ■ Nonetheless, as stated in *Lungren,* "the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735.)

Respondents stress that any interpretation of section 8880.68 which defeats the sales tax exemption is inconsistent with the will of the people because such a construction will diminish net revenues for public education. The manifest purpose of the Act as declared by the people is to provide additional funds for public education without increasing taxes. (§ 8880.1.) Towards this end the Act caps Lottery Commission expenses at 16 percent of total revenues; if less is spent, the surplus goes to public education. (§ 8880.4.) Also, in keeping with this general purpose, section 8880.68 provides incentives to the public to participate in the lottery by, for example, exempting lottery winnings from state income tax, and the purchase of lottery tickets from sales tax.

Scientific Games argues the general intent embraces the Lottery Commission's commercial purchase of tickets from the manufacturer, which apparently is the commission's largest single material cost. As a costly item, sales tax would also be sizable.[9] ■ However, nothing in the Act or the record (including the ballot pamphlet)[10] indicates that the voters were aware of or concerned about an exclusive sales tax exemption for the printing of

---

[9] Prior to the Board's ruling, the Lottery Commission carried approximately $3.3 million on its books as a contingent liability pending resolution of the tax issue. Apparently the commission subsequently released this amount to the public education fund. However, the $3.3 million contingent fund covered games 1-8, and the Lottery Commission never contracted to pay sales tax on those games; it only committed to pay sales tax in contracts governing games 9 and onward. The gross receipts tax is levied upon the *retailer* (Rev. & Tax. Code, § 6051); the law *rebuttably* presumes that the retailer includes sales tax reimbursement in the retail sale price under certain circumstances as, for example, when the agreement of sale provides for such addition of sales tax reimbursement. (Civ. Code, § 1656.1, subd. (a).)

[10] When seeking to ascertain the intent of the voters in approving a ballot measure, we may consider the official statements submitted to the voters. (*Diamond International Corp.* v. *Boas* (1979) 92 Cal.App.3d 1015, 1034 [155 Cal.Rptr. 616].)

instant game tickets, or the fact that the cost and taxing of such tickets would be a considerable expense. The only administrative expense specifically identified in the legislative analyst's commentary was commissions to sellers of lottery tickets, and the only tax relief mentioned therein was exemption of lottery prizes from state income tax. The argument in favor of Proposition 37 likewise only referred to retailer commissions, stating that of the estimated $1.7 billion in first-year ticket sales, approximately $85 million would be paid in retail commissions.

Scientific Games directs us to the rebuttal argument which it maintains is a further indicator of the electorate's intent. This argument states: "No lottery revenue would go to the state. . . ." Scientific Games argues that in derogation of this intent, imposition of sales tax on ticket sales to the Lottery Commission would divert lottery revenues to the state bureaucracy. The answer to this contention is simple: if the people intended to provide tax relief to the Lottery Commission such that no lottery revenues could be used to pay taxes on retail purchases, it would have provided a blanket exemption on the sale of all goods to the commission. As it is, the commission has paid sales tax on numerous items, including computer equipment and its on-line system.

Without question, any sales tax which the Lottery Commission is legally required to pay is a legitimate expense allowable within the 16 percent cap. Section 8880.64 expressly provides that expenses include "all costs incurred in the operation and administration of the Lottery and all costs resulting from any contracts entered into for the purchase or lease of goods and services required by the Lottery, including but not limited to, the costs of supplies, materials, tickets . . . ." The Act contemplates that necessary expenses of the Lottery Commission within the 16 percent limit will be paid out of gross revenues and the *remainder* will be channeled to the public education fund. Paying sales tax on printed tickets or other items is not inconsistent with the purpose of the Act when the Act itself provides for payment of such expenses. Furthermore, it is Scientific Games, not the Lottery Commission, that owes any gross receipts tax; whether it collects the tax from the Lottery Commission by agreement is another matter. Finally, our construction of section 8880.68 does not diminish the purpose of the Act because the lottery will still generate significant additional funds for public education while paying for its legitimate expenses.

### C.  *Construction as a Whole*

Respondents argue that several provisions in the Act refer to "lottery tickets" or "tickets" at various stages of the manufacturing and distribution process, and if tickets are lottery tickets for purposes of those

provisions they are lottery tickets when sold to the Lottery Commission. They draw our attention to section 8880.33 which empowers the Lottery Commission to promulgate rules specifying "the manner of distribution, dissemination or sales of lottery tickets . . ."; section 8880.57, subdivision (b)(9), which details disclosures required of contractors with respect to contracts for "procurement for the printing of lottery tickets . . ."; section 8880.64 which discusses costs of tickets and distribution of tickets; and section 8880.70 which provides that other laws restricting or prohibiting the distribution and sale, etc., of any lottery tickets shall not apply to tickets of the California lottery.

We agree that the scattering of the terms "ticket" and "lottery ticket" throughout the Act is confusing, but none of these provisions defines "lottery ticket." Our job is to resolve the ambiguity. Towards this end, section 8880.12, which defines "Lottery Game," is more instructive. A lottery game is "any procedure authorized by the Commission whereby prizes are distributed among persons who have paid, or unconditionally agreed to pay, *for tickets* or shares *which provide the opportunity to win such prizes.*" (§ 8880.12, italics added.) Thus the printed tickets sold to the Lottery Commission, although in the form of "lottery tickets," do not constitute lottery tickets because they do not provide the opportunity to win prizes. It is the Lottery Commission which establishes, initiates and conducts each lottery game (§§ 8880.12, 8880.25, 8880.28), and only the Lottery Commission can distribute "lottery tickets" which provide an opportunity to win prizes, either through contracts with retailers or directly to the public (§ 8880.33). Under this analysis, printers cannot sell lottery tickets, and section 8880.68 does not become an exemption for printers.

The Lottery Commission has promulgated standard contract terms and conditions which govern their instant game contracts with retailers. Our review of these provisions reinforces our conclusion that the instant tickets do not become "lottery tickets" until in the hands of the commission. The contract terms require that, after receiving lottery tickets from the commission, the retailer must stamp its lottery identification number on the back of each ticket in the area designated for retailer identification. Further, the terms govern the timing of sales to the public. It is the director of the California lottery who designates the opening and closing dates for sale to the public of lottery tickets for a particular instant game. Retailers cannot sell lottery tickets for a designated game before or after these dates.

From this description, it is evident that the instant tickets cannot be sold or played and, thus, do not carry the right to win a prize, until in the hands of the Lottery Commission. Only the Lottery Commission can distribute tickets to retailers, who in turn as directed by the Lottery Commission

stamp their number on each ticket and then release the tickets for sale to the public upon announcement from the director.

Our analysis of the meaning of the term "lottery ticket" as garnered from the statutory and regulatory scheme is in keeping with existing law interpreting Penal Code provisions[11] prohibiting the establishment and promotion of lotteries. We have located one California case explicitly defining the term "lottery ticket." (*Finster* v. *Keller* (1971) 18 Cal.App.3d 836, 848-849 [96 Cal.Rptr. 241].) *Finster* was a declaratory relief action instituted by a store owner and a wholesaler-distributor of horse-racing publications concerning the legality of a "5-10" scheme operated by Caliente Race Track in Mexico for the last six races on scheduled days. The bettor would present a filled-out "5-10" form at the racetrack before post time, pay $2 and receive a validated duplicate of the original form; racetrack management retained all original forms. (*Id.,* at p. 840.) The Court of Appeal concluded that the "5-10" forms were not lottery tickets until validated at the track: "A lottery ticket is a token of a right to participate in the pool [citation]; there is no lottery ticket unless it has been delivered to a player in exchange for payment, or unless it is in a completed form available for such delivery." (*Id.,* at pp. 848-849.) In support of this proposition, the court, in a footnote, cited a turn-of-the-century United States Supreme court case (*Champion* v. *Ames* (1903) 188 U.S. 321 [47 L.Ed. 492, 23 S.Ct. 321]) which upheld a conviction based on the carriage from Texas to California of *numbered* lottery tickets. The *Finster* court inferred from the sustaining of that conviction that "the owners of such tickets had paid the operators of the lottery for them and would resell them in California for the face price; that if not so resold they would nevertheless represent a right to participate in the lottery." (*Finster* v. *Keller, supra,* 18 Cal.App.3d at p. 849, fn. 11.)

We conclude that only the Lottery Commission, not the printer, can sell lottery tickets which represent a right to participate in a particular instant game. Further, when Scientific Games delivers printed tickets to the Lottery Commission, the tickets are not in completed form, ready to retrieve a prize. Under the Act, the lottery may not pay any prize "arising from tickets or shares that are . . . unissued . . . ." (§ 8880.32, subd. (b).) The Lottery Commission, not Scientific Games, issues the tickets. Tickets cannot be sold and, thus, are not ready for delivery to the bettor, until the retailer has stamped its identification number on the ticket and the director announces the game.

---

[11] Penal Code section 319 *et seq.*

## D. *Surplusage*

Scientific Games also contends that Gilroy's interpretation of section 8880.68—i.e., that the tax exemption applies only to the sale of lottery tickets to the gambler—would render the tax exemption mere surplusage because such sales are already exempt under existing law. This argument is based on the distinction between tangible and intangible personal property. California imposes a sales tax on "the privilege of selling tangible personal property at retail . . . ." (Rev. & Tax. Code, § 6051.) When a gambler purchases a lottery ticket, he or she buys an opportunity to win a prize; the ticket is a mere indicia of that right.

The Board has interpreted similar situations as creating an intangible right, which is not subject to tax. For example, the Board has ruled that the sale of coupon books entitling the purchaser to various services at no charge is the sale of an intangible right to receive the services listed in the coupon; accordingly, sales tax is only applicable to the printer's charge for printing the booklets, not to the sale of booklets to the public. (St. Bd. of Equalization, Sales Tax Counsel Rulings, Business Taxes Law Guide: Sales and Use Tax Annot. (Oct. 22, 1956) ¶ 540.0180.) Similarly, in clarifying the distinction between the sale of tangible personal property and the performance of a service, the Board issued regulation 1501 which sets forth the "true object" concept as determinative of taxability: "The basic distinction in determining whether a particular transaction involves a sale of tangible personal property or the transfer of tangible personal property incidental to the performance of a service is one of the true objects of the contract; that is, is the real object sought by the buyer the service per se or the property produced by the service. If the true object of the contract is the service per se, the transaction is not subject to tax even though some tangible personal property is transferred." (Cal. Code Regs., tit. 18, ch. 2, § 1501.) Thus, under our sales and use tax laws and without regard to section 8880.68, the sale of lottery tickets to the betting public would not be subject to sales tax, but the sales of printed tickets to the commission would be unless it is established that one or more of Scientific Games' reserved defenses[12] applies.

However, the section 8880.68 prohibition against the levy of state and local taxes "upon the sale of lottery tickets" is *broader* than the standard provision for a sales tax exemption, which typically is framed in language referring to a levy on the *retailer's* "gross receipts" from the sale of tangible personal property. The language itself permits application to additional, otherwise taxable situations arising from the sale of lottery tickets, which in turn defeats casting the provision as extraneous. For example, a city can tax

---

[12] See footnote 6, *ante*, page 596.

amusements and any other lawful business transacted within its borders. (§ 37101.) In this context section 8880.68 would operate to prevent a city from levying an otherwise lawful license tax on retailers under contract with the Lottery Commission with respect to their sale of lottery tickets to the public. Further, carrying section 8880.68 to an illogical extreme, the provision literally could be interpreted as precluding tax on the income retailers derive from selling lottery tickets to the public (minimum compensation set at 5 percent of the retail price of tickets [§ 8880.51]).

### III. CROSS-APPEAL

Scientific Games demurred to Gilroy's complaint, asserting in part that Gilroy lacked standing to challenge the Board's final refund decision and in any event that the decision could not be collaterally attacked. The trial court overruled the demurrer, and Scientific Games has cross-appealed, bringing before us these same standing and preclusion issues.

### A. *Standing*

■ Gilroy seeks a peremptory writ of mandate directing the Board to set aside its refund decision and issue a new decision denying Scientific Games' claim. Scientific Games argues that Gilroy lacks standing to disturb the Board's final refund decision.[13] Gilroy counters that our recent decision in *County of Sonoma* v. *State Board of Equalization, supra,* 195 Cal.App.3d 984, is directly on point and supports a determination of standing in this case. We disagree, but our decision only affects Gilroy's request to reverse the refund decision.

The statutory procedure[14] for obtaining a refund of erroneously collected taxes permits a *taxpayer* asserting overpaid taxes to present a written refund claim specifying the grounds for the claim. (Rev. & Tax. Code, §§ 6902, 6904.) The *claimant* may then seek review of an unfavorable Board determination within 90 days after the Board's mailing of notice of its decision. (Rev. & Tax. Code, § 6933.) Thus the refund decision became final as to Scientific Games upon expiration of the 90-day statute of limitations. Moreover, the Board's jurisdiction in the matter ended when it rendered its decision, and it now lacks authority to rescind the refund. (*Kirk* v. *County of San Luis Obispo* (1984) 156 Cal.App.3d 453, 460 [202 Cal.Rptr. 606].)

Nothing in the Revenue and Taxation Code or the Bradley-Burns Law in particular confers on local entities the right to notice of, or to participate in,

---

[13] Gilroy points out that the Lottery Commission and the Board did not cross-appeal and, thus, urges us to disregard their standing arguments. Gilroy's point is irrelevant because Scientific Games has cross-appealed, raised and argued the standing issue.

[14] Revenue and Taxation Code section 6901 et seq.

refund proceedings initiated by retailer-taxpayers within their jurisdiction. Only the Board has the authority to determine whether taxes have been erroneously or illegally collected or computed. (Rev. & Tax. Code, § 6901.) Subject to approval by the State Board of Control for amounts exceeding $50,000, the Board then credits or refunds the excess. (*Ibid.*) From this statutory scheme it is clear that local entities have no authority to intervene in the refund process or otherwise seek to vacate the Board's refund decision.

Our decision in *County of Sonoma* does not dictate a different result. There we held that in view of the fact that the Bradley-Burns Law required Sonoma County to contract with the Board to administer its sales tax ordinance, the act implicitly granted the county standing to judicially challenge the Board's actions under the contract, including its interpretation and application of a statutory tax exemption. (*County of Sonoma* v. *State Board of Equalization, supra,* 195 Cal.App.3d at pp. 989-990.) *County of Sonoma* is readily distinguishable from the present case because it did not involve a collateral attempt to overturn a *final* administrative refund decision of the Board.

The Board's refund decision, however, has ramifications beyond the refund proceedings themselves and serves as the predicate for the Board's demand that Gilroy return its $659,000 "share" of the refund. The Board's actions to reclaim sales tax revenue from Gilroy, and its decision whether to collect sales tax from Scientific Games in the future are taken pursuant to its duties and powers under the Bradley-Burns Law and the Agreement. Thus, in keeping with the rationale of *County of Sonoma* we conclude Gilroy has standing to challenge these actions unless otherwise barred by principles of collateral estoppel.

## B. *Collateral Estoppel*

■■■ Scientific Games maintains that the Board's final refund decision operates to collaterally estop Gilroy from "relitigating" the legal issues relating to interpretation and application of section 8880.68. ■■■ Collateral estoppel will preclude relitigation of an identical issue finally decided on the merits in an earlier action when the party to be estopped was a party or in privity with a party to the prior proceeding. (*Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 534-535 [234 Cal.Rptr. 795].) ■■■ Our Supreme Court has held that collateral estoppel will apply to decisions of administrative agencies where the agency is acting in a judicial capacity to resolve disputed issues of fact properly before it, and the proceedings provide the parties with an adequate opportu-

nity to litigate their claims. (*People* v. *Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321].)

The question of whether Scientific Games sold Lottery tickets to the commission is one of law. ■■ Nonetheless, a prior judgment on a question of law is conclusive in a subsequent action between parties or their privies where both causes arose out of the same subject matter or transaction, and where the conclusive reach of that judgment to the present action will not result in an injustice. (*Carmel Valley Fire Protection Dist., supra,* 190 Cal.App.3d at p. 536.)

■■ The Board's decision is not conclusive as to Gilroy's present claims because neither the Board as decision maker nor the Board's staff was in privity with Gilroy.[15] ■■ We begin by observing that the concept of privity operates as a safety valve to defeat the preclusive effect of a prior decision in circumstances where such a result would be unfair. " 'Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity.' " (*People* v. *Sims, supra,* 32 Cal.3d at p. 486.) The term "privity" " 'represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion.' " (*People* v. *Dawkins* (1987) 195 Cal.App.3d Supp. 1, 6 [241 Cal.Rptr. 456].)

■■ Scientific Games argues that privity exists because the Board is Gilroy's exclusive statutory and contractual agent to perform all functions pertaining to administration and operation of Gilroy's sales tax ordinance. (Rev. & Tax. Code, § 7202, subd. (a).) Courts have held that agents of the same government are in privity with each other because they represent not their own rights, but the rights of the government. (See *People* v. *Sims, supra,* 32 Cal.3d at p. 487.) However, Scientific Games' argument does not account for the diverse roles which the Board may assume, including decision maker on a refund claim as well as agent for local jurisdictions to implement their sales tax laws. Certainly, no one could reasonably argue that Gilroy was in privity with the Board *as decision maker.* Nor, upon closer look, can we say that Gilroy was in privity with the Board's staff, although Gilroy's contentions here are for all practical purposes identical to those made by the audit staff before the Board.

---

[15] By way of background, we note the following persons appeared at the Board hearing on Scientific Games' petition for redetermination: (1) for the Board staff, the hearing officer and the assistant chief counsel as well as the assistant executive secretary of the Business Taxes section of the Board; (2) attorneys for Scientific Games; and (3) attorneys for the Lottery Commission.

The function of the Board's staff at a Board hearing is *not* to advocate or advance the position of the local entity for whom sales tax was allegedly erroneously collected. To the contrary, regulations defining the function of the Board staff at a Board hearing provide otherwise: "Hearings before the board . . . are not in the nature of trials or contests between adverse parties. They are meetings of the board at which the taxpayer presents orally to the board his arguments for a reduction or cancellation of a liability previously determined against him or for a refund of tax previously paid. *It is the duty of the staff of the board at the hearings to assist the board in ascertaining the facts and in determining the correct application of the law and the regulations to the facts.*" (Cal. Code Regs., tit. 18, § 5054, italics added; see also *id.,* at § 5057.) Thus the staff does *not* fully litigate the local entity's position, but rather serves as an adjunct to the Board/decision maker in defining the facts and applying the law. The limited, nonadversarial role of the staff is accented by the fact that whereas the taxpayer/claimant can seek judicial review of the Board's decision, there is no mechanism for the staff to "challenge" the Board's final determination. Under these constraints we do not think the relationship between the staff and Gilroy is "sufficiently close" to warrant application of collateral estoppel. We therefore conclude the Board's decision does not preclude Gilroy from litigating the interpretation of section 8880.68 in the present action.

## IV.  CONCLUSION AND DISPOSITION

### A.  *Writ of Mandate*

Code of Civil Procedure section 1085 authorizes the trial court to issue a writ of mandate "to compel the performance of an act which the law specifically enjoins . . . ." Mandamus is brought upon verified petition of the beneficially interested party. (See Code Civ. Proc., § 1086.) These terms translate into a two-sided requirement for mandamus: "[T]here must be a clear, present, ministerial duty upon the part of the respondent and a correlative clear, present, and beneficial right in the petitioner to the performance of that duty." (*Sullivan* v. *State Bd. of Control* (1985) 176 Cal.App.3d 1059, 1063 [225 Cal.Rptr. 454].) The writ must issue in all cases where petitioner has no "plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.)

It goes without saying that Gilroy had no other adequate remedy. Gilroy has no right to notice of, or standing to participate in or appeal from, refund proceedings between the Board and Scientific Games. The matter of the Board's duty and Gilroy's correlative right must be determined with reference to their respective rights and duties under the Bradley-Burns Law, the

Agreement and the Sales and Use Tax Law[16] when viewed in light of our interpretation of section 8880.68.

On rehearing Scientific Games and the state agencies argue that any writ commanding the Board to collect a sales tax on the sale of tickets to the Lottery Commission contains an unfounded and impermissible presumption in favor of sales tax liability which usurps the Board's statutory discretion in deciding the two reserved issues, namely, whether (1) the transactions are exempt sales for resale or (2) in some instances the proper tax is a use tax, not a sales tax.

This argument overlooks the broad statutory presumption in favor of taxability: "For the purpose of the proper administration of this part and to prevent evasion of the sales tax it shall be presumed that all gross receipts are subject to the tax until the contrary is established. The burden of proving that a sale of tangible personal property is not a sale at retail is upon the person who makes the sale unless he takes from the purchaser a certificate to the effect that the property is purchased for resale." (Rev. & Tax Code, § 6091.)

Further, in a purely procedural sense, the reserved issues now exist in a vacuum. Scientific Games raised the issues in connection with refund claims for the period August 1, 1985, through January 31, 1987. We have concluded the Board's refund decision on those claims is final. Therefore, there is no present assessment to which these issues attach.

Gilroy argues, and we initially concurred, that it is entitled to a writ of mandate directing the Board to collect and transmit to Gilroy a 1 percent sales tax on Scientific Games' gross receipts from the retail sale of printed matter sold in the city to the Lottery Commission. Such a writ could lead to a tripling of litigation if Scientific Games initiated second and third rounds of refund proceedings asserting once again, but one at a time, the sale for resale and use tax defenses.

On rehearing we have determined from a practical point of view that the Board must first determine whether the reserved defenses apply to either pre- or post-January 31, 1987, sales. Therefore, we think the reasonable approach is to remand the case to the trial court with directions to issue a peremptory writ directing the Board to decide whether to assess a tax on Scientific Games' gross receipts from the sale of tickets sold in the city to the Lottery Commission after January 31, 1987. The writ shall further command that this decision must (1) be consistent with our opinion and (2)

---

[16] Revenue and Taxation Code section 6001 et seq.

resolve the applicability of the reserved defenses, in accordance with the law. The resolution of reserved issues must also take into account facts surrounding pre-January 31, 1987, sales in order to clarify whether the $659,044 withheld is also subject to one or both of the defenses. Finally, the writ shall be made expressly returnable to the trial court within a reasonable period of time set by that court. (Code Civ. Proc., § 1108.)

We affirm the trial court's ruling denying Gilroy a peremptory writ of mandate directing the Board to set aside its refund decision and issue a new decision denying Scientific Games' claim for refund. We reverse insofar as the trial court determined that Gilroy was not entitled to *any* relief by way of mandamus. Therefore we remand the cause to the trial court with directions to issue a writ of mandate consistent herewith.

### B. *Preliminary Injunction*

Gilroy applied for a preliminary injunction enjoining the Board from withholding monies from sales tax revenues due to Gilroy in order to reclaim Gilroy's portion of the erroneous refund. The Board and Lottery Commission argue that issuance of a writ would not provide Gilroy with meaningful relief because only the state controller can recover an erroneous refund.[17] Gilroy is not asking the Board to prosecute a refund-recovery action. It merely seeks to prevent the Board from recouping Gilroy's "share" of the refund. To the extent the Board might suffer a shortage of funds because our decision would hinder its ability to recover Gilroy's "share," this could perhaps be remedied by action of the controller, pursuant to Revenue and Taxation Code section 6961, to recover the erroneous refund.

The trial court abused its discretion in denying Gilroy's application for preliminary injunction because it based its decision on an erroneous legal conclusion. But since, as discussed above, Gilroy's ability to recoup its $659,044 "share" of the refund hinges in part on resolution of the reserved issues, we reverse and remand on this matter with directions to the trial court to exercise its discretion—consistent with our interpretation of section 8880.68—to decide Gilroy's application.

If neither defense applies, the Board will have no legal authority to continue offsetting Gilroy's "share" against its current sales tax revenues.

---

[17] Revenue and Taxation Code section 6961 provides: "The Controller may recover any refund or part thereof which is erroneously made and any credit or part thereof which is erroneously allowed in an action brought in a court of competent jurisdiction in the County of Sacramento in the name of the people of the State of Callifornia."

Without further briefing and factual development, the question of the Board's *actual* ability to disgorge *past* offsets is not apparent. Therefore, we also instruct the trial court to conduct further proceedings, as the necessity may arise, on this matter.

Affirmed in part and reversed in part. Parties to bear their own costs on appeal.

Poché, J., and Perley, J., concurred.

The petition of the real parties in interest for review by the Supreme Court was denied November 15, 1989.