[No. F008742. Fifth Dist. July 25, 1988.]

MICHAEL PAREDES et al., Plaintiffs and Appellants, v.
COUNTY OF FRESNO, Defendant and Respondent.

COUNSEL

Litt & Stormer, Michael S. Magnuson, Marsh & Williams and Scott W. Williams for Plaintiffs and Appellants.

Stammer, McKnight, Barnum & Bailey, Daniel O. Jamison and Galen McKnight for Defendant and Respondent.

OPINION

**WOOLPERT, Acting P. J.**—This appeal follows the trial court's order granting summary judgment in favor of defendants County of Fresno and Fresno County Department of Health. We are asked to determine whether a county health officer has the duty to take action against operators of small public water systems, within the county's boundaries, which are contaminated with DBCP[1] above an "action level"[2] of 1.0 parts per billion. We conclude the answer is a qualified "no."

A local health officer acts for the Director of the State Department of Health Services (DHS). The director is empowered by the Legislature to set primary and secondary drinking water standards for enforcement purposes. The DHS does not employ the DBCP "action level" as an absolute, enforceable maximum safe drinking water standard. Accordingly, a county health officer lacks independent authority to take a conflicting course of action against operators of small public water systems which are contaminated with DBCP above the "action level."

While the DBCP "action level" is not an enforceable standard,[3] the state and the defendants, in the absence of a DBCP standard, are nevertheless

---

[1] DBCP is the acronym for 1-2-Dibromo-3-chloropropane, a fumigant used to control nematode infestation of grapes, tomatoes and tree fruit. Its use was banned in California in 1978.

[2] An "action level" is a level of contamination which, if exceeded, signals, in the opinion of the State Department of Health Services, a need for caution by potential water consumers.

[3] The word "enforceable" is ambiguously used by the parties. At times it is used to mean mandatory action; at times the sense is of doing something less than to eliminate all human

taking action to monitor DBCP levels and notify all users of such contaminated water of the chemical's presence. Therefore, on review, we find there was no triable issue of fact; the order granting summary judgment was appropriate.

## SUMMARY JUDGMENT

Plaintiffs Michael Paredes, Pam Galey, Shannon Galey (by and through her guardian ad litem, Pam Galey), and Samuel Gitchel, as concerned citizens and taxpayers, filed suit against defendants seeking declaratory and injunctive relief to remedy the problem of DBCP contaminated water in small public water systems within Fresno County. In relevant part, plaintiffs sought the following judicial declaration: defendants had an affirmative duty to take necessary and appropriate action against operators of such systems which were contaminated with DBCP above the "action level" of 1.0 parts per billion. In answering the complaint, the defendants alleged, as one of several affirmative defenses, they were under no duty to provide the relief sought.

Defendants ultimately sought summary judgment against plaintiffs on the theory an "action level" was not a drinking water standard under the Pure Water Law (Health & Saf. Code, § 4010 et seq.)[4] and was therefore unenforceable. As well as opposing the summary judgment motion, plaintiffs filed their own motion for summary adjudication of issues.

Plaintiffs conceded an "action level" was not a drinking water standard within the meaning of the relevant Health and Safety Code provisions. Nevertheless they maintained an "action level" represented the point at which there was scientific consensus that contamination presented a potential risk to public health, *and* was enforceable.

In granting defendants' motion for summary judgment and denying plaintiffs' motion for summary adjudication, the trial court concluded plaintiffs had not shown any evidentiary or legal basis for imposing a duty upon the defendants. This appeal followed.

---

consumption of the water. At times "enforceable" as used in connection with "standard" is misleading. If emphasis is directed to the use of the word "standard," the matter is more clearly understood. Thus, a "standard," as here used, means a level of contaminants above which no human consumption is permitted. An enforceable primary standard then means a level of contaminants in water which must be eliminated by enforcement action of the DHS or local public health official. A broader use of the word "enforceable" may mean only that less drastic means may be employed to protect the public. Thus, both the state and county agencies may "enforce" against potentially risky water use when contaminant levels are above "action level" by warnings, suggestions, etc., but not prohibition.

[4] All statutory references are to the Health and Safety Code unless otherwise indicated.

## FACTS

The California Legislature has declared water delivered by public water systems[5] in this state should be at all times pure, wholesome, and potable. It has adopted procedures to be followed in an effort to accomplish this objective in sections 4010.1 through 4039.5. (§ 4010.) These sections describe the permit process for the operation of a public water system (art. 1, §§ 4011-4022), the regulation of the quality of the water supply of a public water system (art. 2, §§ 4023.5-4030.7), violations (art. 3, § 4031), remedies (art. 4, §§ 4032-4036.5), judicial review (art. 4.5, § 4037), and applicable crimes and penalties (art. 5, §§ 4037.5-4039.5).

Any person who operates a public water system must: comply with primary and secondary drinking water standards; ensure the system will not be subject to backflow under normal operating conditions; and provide a reliable and adequate supply of pure, wholesome, healthful, and potable water. (§ 4017.) Primary drinking water standards specify maximum levels of contaminants which, in the judgment of the DHS director, may have an adverse effect on the health of persons. (§ 4010.1, subd. (b)(1).) Secondary drinking water standards specify maximum contaminant levels which, in the judgment of the director, are necessary to protect public welfare. Secondary drinking water standards may apply to any drinking water contaminant which may: (1) adversely affect the odor or appearance of such water and cause a substantial number of persons served by the public water system to discontinue its use; or (2) otherwise adversely affect the public welfare. (§ 4010.1, subd. (b)(2).) Maximum contaminant level means the maximum permissible level of a contaminant in water. (§ 4010.1, subd. (c).)

The regulations establishing primary and secondary drinking water standards for public water systems are contained in title 22 of California Code of Regulations, section 64401 et seq. (22 Cal. Code Regs., § 64401, subd. (a).) Those drinking water standards are based upon the national interim primary and secondary drinking water regulations contained in the Code of Federal Regulations.

As of September 1985, there were only 17 maximum contaminant levels. A maximum contaminant level takes into account a health-based risk assessment of a particular contaminant as well as social and economic factors. The last maximum contaminant level was adopted in the late 1970's. Nevertheless, new contaminants have been and continue to be found in drinking water supplies. In California, when a contaminant is discovered for which

---

[5] A public water system is a system which provides piped water to the public for human consumption and has 5 or more service connections or regularly serves an average of at least 25 individuals daily at least 60 days a year. (§ 4010.1, subd. (e).)

there is no primary or secondary standard, the Sanitary Engineering Branch of the DHS asks another branch of the DHS, the Community Toxicology Unit, to develop an "action level."

In 1979 the DHS established such an "action level" for DBCP. In a news release concerning DBCP contamination of ground water supplies, the DHS described in relevant part the following: "[A] six-months investigation of contamination of groundwater supplies in 24 California counties indicates that dibromochloropropane (DBCP) was present in some amount in 193 of the 527 samples, or in 36.6 percent of the total sampled.

"Sixty-three of the 527 samples (12 percent) showed more than the 1 part per billion (ppb) 'action level' at which the Department recommends avoiding consumption and, if possible, using alternate water supplies free of DBCP. (The 1 ppb 'action level' is not an official danger level. It represents the Department's interim scientific consensus as a benchmark figure to signal a need for caution by potential consumers of DBCP-contaminated water.)

"In testimony prepared for presentation at a Federal Environmental Protection Agency (EPA) hearing in Washington, DC, today John M. Gaston, Chief of the Department's Sanitary Engineering Section, said the over 'action level' contamination constitutes a health hazard for residents of the affected communities, most of which are located in the San Joaquin Valley.

"However, Gaston cautioned that the exact degree of health hazard can not [*sic*] be accurately determined based on the research thus far accomplished. . . ."

In 1980, the Legislature enacted as an urgency measure, section 4026.1, mandating the DHS to establish a program for detecting and monitoring organic chemical contaminants in drinking water other than those for which primary drinking water standards had been adopted. The Legislature was concerned about those organic chemicals which, if present in significant concentrations in drinking water, could have an adverse effect on health. (§ 4026.1, subd. (a).) After the DHS submitted its plan for detecting and monitoring organic chemical contaminants in drinking water in 1981, the Legislature, by enactment of section 4026.2 in 1983, gave the department new authority to require monitoring for unregulated organic chemicals, that is, organic chemicals for which no drinking water standards had been set.

Section 4026.2 requires the DHS to conduct an evaluation of each public water system to determine the potential for contamination, and upon a determination a system is subject to potential contamination, to notify the

public water system of the specific contaminants to be analyzed. (§ 4026.2, subd. (b)(1) & (2).) Upon notification, the public water system shall prepare a proposed systematic water analysis plan for the contaminants. If that plan is approved by the department, the system shall conduct the water analysis and submit a water analysis report to the department within certain specified time requirements. (§ 4026.2, subd. (b)(3) & (4).) After reviewing the report, the department may require the system to conduct periodic water analysis in accordance with conditions specified by the department. (§ 4026.2, subd. (b)(5).)

In implementing section 4026.2, the DHS's Sanitary Engineering Branch in 1984 adopted guidelines for its response when an "action level" is exceeded in a public water system. The guidelines provided in relevant part: "In cases when a water system reports positive results in samples from one or more wells we should proceed as follows:

"1. A letter shall be sent to the water system indicating that the water analysis report has been received and that it meets the requirements of the law. The water system should be asked to confirm all positive results. When a chemical is detected that exceeds an 'Action Level' the finding shall be confirmed and a duplicate sample shall be collected for analyses by the Sanitation & Radiation Lab or the Southern California Lab.

"2. When a chemical exceeds an 'Action Level' and the finding is confirmed we shall send a letter to the water system acknowledging the confirmation and recommending that the water system discontinues the use of the affected well. The water system will be permitted to blend wells to be in conformance with an 'Action Level.' The water system should be encouraged to announce its findings either through a formal notification of customers or via the news media. If the water [*sic*] is not willing to carry out the notification, we will inform other agencies, political entities and the press of the findings. This can be done by sending a copy of the confirmation letter to these various groups.

"3. If an affected well must be used, consumers shall be notified by the water system. The use of an alternative source of water (i.e., bottled water) shall be recommended.

". . . . . . . . . . . . . . . . . .

". . . Wells with chemicals that exceed 'Action Levels' that must be kept in service should be monitored at least monthly."

The DHS, however, does not directly regulate and monitor all public water systems in California. Under section 4010.8, for water systems with

less than 200 service connections, the local health officer is responsible for the enforcement of the Pure Water Law, i.e., to "act for the department." Notably, small public water systems (those with 200 connections or less) are in essence exempt from section 4026.2. In 1985, however, the Legislature found, with its enactment of section 4026.3, it was in the interest of all Californians that a testing program for small public water systems be implemented and carried out as expeditiously as possible. (§ 4026.3, subd. (a)(5).)

Section 4026.3 provides, in relevant part: "(c) The department shall conduct training workshops to assist health officers in evaluation of small public water systems for organic chemical contamination, and in sampling and testing procedures. The department shall, at a minimum, provide health officers with guidelines for evaluating systems and instructions for sampling.

"(d) The department shall develop a schedule for conduct of the programs by the local health officers. The schedule shall establish a program to address first those systems with the most serious potential for contamination. The department shall enter into agreements with the local health agencies to conduct the necessary work to be performed pursuant to the schedule. The department shall begin the program no later than three months after the effective date of this section. All local health officers shall complete the evaluation, sampling, testing, review of sampling results, and notification to the public water systems within their jurisdiction in accordance with the agreements entered into with the department and within the schedule established by the department. All work required by this section shall be completed within three years of the effective date of this section.

"(e) In consultation with the department, the local health officer shall conduct an evaluation of all small public water systems under their jurisdictions to determine the potential for contamination of groundwater sources by organic chemicals. These evaluations shall follow the criteria set forth under paragraph (1) of subdivision (b) of Section 4026.2.

"(f) Based upon the evaluation of each system, the local health officers shall develop a sampling plan for each system within their jurisdiction. The health officer shall collect samples in accordance with the plan and shall submit the samples for analysis to a certified laboratory designated by the department. When applicable, the laboratory shall test water samples using the Environmental Protection Agency's 13 approved analytical techniques established under subdivision (h) of Section 304 of the Clean Water Act to qualitatively identify the complete range of contaminants in the same class as the specific contaminant or class of contaminants being analyzed.

"(g) Within 10 days of the receipt from the laboratory of the testing results, the local health officer shall notify the small public water system, the department and the California regional water quality control board for that region of the results.

"(h) Following a review of the testing results, the local health officer may order the public water system to conduct a periodic water sampling and analysis program in accordance with conditions specified by the local health officer. The department shall provide ongoing advice and assistance to local health officers in interpreting test results and determining appropriate notification and followup activities in those instances where contaminants are found.

"(i) This section shall be operative during any fiscal year only if the Legislature appropriates sufficient funds to pay for all state-mandated costs to be incurred by local agencies pursuant to this section during that year."

Consistent with section 4010.8, defendant County of Fresno, Department of Health, enforces the Pure Water Law for approximately 233 small public water systems within the county. The county inspects and tests each of these systems on at least an annual basis. Since the "action level" for DBCP was announced in 1979, the county has tested for DBCP in the small public water systems. When the DBCP "action level" is exceeded, the county's practice is to provide the operator with a copy of the sample results as well as a written notice which provides in pertinent part: " 'The Health Department recommends that consumption of water with the chemical DBCP exceeding one (1) part per billion (ppb) be avoided. Therefore, we recommend that you use bottled water for drinking purposes. Ultimately, the solution to the problem would be to drill a deeper well, or to install an adequately designed activated carbon filtration unit for DBCP removal.' " It is also the county's practice to test more frequently those systems with DBCP above the "action level," both to verify the previous testing and keep track of the level of contamination.

## DISCUSSION

 Plaintiffs contend the county has an affirmative duty to take necessary and appropriate action against small public water system operators whose water supplies are contaminated above the action level for DBCP. By contrast, defendants urge only primary and secondary water standards are enforceable under the Pure Water Law, not an "action level." Fundamental to both the motion for summary judgment and the motion for summary adjudication is the issue of the meaning and implications of the term "action level." Also critical is the inference plaintiffs draw that the county is

doing virtually nothing about DBCP contaminated water in small public water systems within its jurisdiction, while the DHS is taking an active role in eliminating DBCP contaminated water in the public water systems within its jurisdiction.

First, independent of the Pure Water Law, plaintiffs contend the county has been empowered to prevent water pollution and take such action as may be necessary to preserve and protect the public health. They cite sections 203, 205, subdivision (d), 208, 450 and 452, in this regard. We agree there has been such authority provided generally. It is limited to the unincorporated territory of the county. (§§ 450, 452.)

Based on these powers, plaintiffs argue, the county must act without regard to whether the DHS has adopted a primary or secondary water standard for DBCP. In essence, plaintiffs suggest each county must determine for itself whether contaminants such as DBCP should be prohibited above a certain concentration in the water. They rely upon *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476 [204 Cal.Rptr. 897, 683 P.2d 1150], for the proposition that local legislation—or the exercise of powers generally assigned by statute—which is not in conflict with specific statewide regulations concerning the protection of health is permissible and not preempted by legislative implication.

■ Local governmental action is not prohibited if otherwise authorized by law, and not in conflict with specific detailed general law. Such conflicts exist when the local legislation or action duplicates, contradicts, or enters into an area fully occupied by general law. (*Id.* at p. 484.) Local governmental action is prohibited when the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern. (*Id.* at p. 485.)

■ In this instance, the Legislature has assigned to the DHS the duty to set standards regarding unhealthy levels of contaminants in drinking water. Local decisions on the same subject, varying from county to county, cannot be justified. The present case is unlike the problem faced in *County of Mendocino,* where the court permitted the imposition of local standards for aerial application of herbicides. Environmental differences such as location of schools, dwellings, hospitals, and recreational areas required flexibility in the regulations for applying herbicides. Local determination was deemed appropriate and not in conflict with the state's mandate. (*Id.* at p. 486.)

In contrast, the degree of permissible levels of water contaminants depends upon scientific expertise and judgment which, difficult as that may be

to resolve, applies generally to all users of water statewide. We do not agree with plaintiffs' suggestion that a resident in one area may be exposed to health hazards from contaminated water, while a resident elsewhere will not, merely because different local health officers have reached conflicting judgments concerning the risk. As we shall explain, the Legislature has dictated that statewide standards be set, and thus made it clear local health officers are to be concerned with enforcing, not creating, such standards.

■ The county's specific powers of enforcement over small public water systems now come exclusively from the detailed provisions of the Pure Water Law. (See § 4010.8.) A review of the Pure Water Law makes clear that the county in enforcing those Health and Safety Code provisions for small public water systems acts with no greater or independent authority than the DHS. Instead, the county only acts in place of, and for, the DHS with regard to small public water systems.

■ With the exceptions of sections 4010.8 and 4026.3, discussed above, the Pure Water Law speaks in terms of the DHS's powers and actions. In fact, the Legislature has mandated that the DHS formulate and adopt rules and regulations regarding testing necessary to determine the quality of domestic water systems and to establish schedules for compliance. (§ 4026, subd. (a).) Moreover, primary and secondary drinking water standards are set based upon the judgment of the director of the DHS. (§ 4010.1, subd. (b) & (c).) Because the county acts "for" the DHS with regard to small public water systems, the critical question appears to be whether the DHS uses the "action level" for DBCP in drinking water as an enforcement standard. If the answer is "yes," then there might be a triable issue of fact regarding whether the county is properly carrying out the mandates of the department.

Second, while plaintiffs argue the DBCP "action level" must be enforced, neither the evidence presented nor the law support such an argument. On the issue of the meaning of "action level," the evidence consists of the actual news release quoted earlier, the excerpted deposition testimony of Richard Jackson, M.D., employed by the DHS and at one point, the chief of the Community Toxicology Unit, and David Storm, Ph.D., employed as a staff toxicologist in the sanitary engineering branch of the DHS.

On its face, the news release announcing the "action level" for DBCP sets forth that the "action level" is "not an official danger level. It represents the Department's interim scientific consensus as a benchmark figure to signal a need for caution by potential consumers of DBCP contaminated water." According to Dr. Jackson: "An action level is a recommended contaminant level that is, for the most part, health-based; that is recommended by the

Department of Health Services as being a level at which drinking water could be safely delivered to a consumer.

". . . . . . . . . . . . . . . . . . .

"[Action levels] are, if you will, consensus figures that come from the Public Health professionals in the Health Department in recommendations as to what we think is a safe and acceptable level of drinking water contaminants, at least for the short term."

In his declaration, Dr. Storm similarly stated: "An action level is a health advisory guideline that is based strictly on potential health effects of consuming water containing the substance. An action level is an interim guide employed to protect the public health, pending the regulatory process that results in adoption of primary or secondary drinking water standards."

■ Based on the foregoing, we conclude an "action level" is not a maximum contaminant level which must be enforced under the relevant provisions of the Health and Safety Code.

Nevertheless, plaintiffs contend drinking water which exceeds the "action level" of one part per billion for DBCP is not "pure, wholesome, healthful, and potable," words which they describe as the basic water standard in California. Accordingly, plaintiffs urge the county should enforce the "action level."

■ "Pure, wholesome, healthful, and potable" water is not a drinking water standard under the Pure Water Law, but rather the *objective* of the state's Pure Water Law. (§ 4010.) To attain that objective, the director of the DHS is empowered to set primary and secondary drinking water standards which specify maximum contaminant levels. (§§ 4010 & 4010.1, subds. (b)(1) & (2).) The words "pure, wholesome, and potable" or "pure, wholesome, healthful, and potable" are used in sections 4015 (denial of an operator's permit), 4016 (granting of an operator's permit), 4017 (duties of a public water systems operator), and 4026, subdivision (b) (regulations concerning the control of cross-connections), as well as section 4010.

Plaintiffs complain that in order to give the words "pure, wholesome, healthful, and potable" some meaning, they must be interpreted as the state's basic water standard. Notably, there is neither caselaw nor legislative history to assist in interpreting the phrase. Yet, these words are meant to state in general terms a goal or objective of the people of California. Moreover, to reach that goal, specific standards must be and are being set.

The Legislature has recognized the danger to public water systems posed by some chemical contaminants for which drinking water standards have not been set. (§§ 4026-4026.3.) However, the Legislature has chosen to deal with that danger by means of testing, notification, and monitoring. (§§ 4026.2, 4026.3, and 4028.) The Legislature has not seen fit to combat the danger by making civil and criminal sanctions otherwise set forth in the Pure Water Law, available as means of enforcement with regard to such chemicals.

As described above, when an "action level" is exceeded in a large public water system, the DHS confirms the finding, recommends that the operator discontinue use of the particular well and encourages the operator to announce the contamination finding to its users. If the operator is unwilling, the DHS will inform other agencies and the news media, so as to notify users of the affected water system. If the well remains in use, the DHS will notify users and recommend they use an alternative source of water.

Defendants follow essentially the same protocol. They notify the operator when the "action level" is exceeded. They also recommend the use of bottled water for drinking purposes, and the ultimate solution of drilling a deeper well or installing an adequate filtration unit for DBCP removal. Further, since the 1986 effective date of section 4028 (which requires, among other things, notice to *all* users of an affected water system), the county has compelled the operators to notify their users.

Yet, plaintiffs argue the state's policies and practices have resulted in the virtual elimination of DBCP above the action level in large public water systems, while in Fresno County's small public water systems, DBCP remains. The evidence offered on the motions for summary judgment and summary adjudication, however, do not support such posturing. Dr. Storm of the Sanitary Engineering Branch (SEB) of DHS declared:

"*In most instances* in which a substance has been found in drinking water in amounts exceeding the action level, the contamination has been reduced to below the action level as a result of SEB use of the attached policy guidelines." (Italics added.)

Similarly, on the local level, the Assistant Director of Health for defendant Fresno County Department of Health declared: "Our file reflects that the number of systems that have tested above action level for DBCP has decreased since 1979 and there are presently only three."

We conclude the trial court acted appropriately in determining plaintiffs had not shown any evidentiary or legal basis for imposing a duty

upon the defendants to enforce the "action level" for DBCP. Under these circumstances, local health officers act "for" the director. The director has been empowered by the Legislature to issue "standards" for enforcement. Because those standards are determined "in the judgment of the director," action against these county defendants was inappropriate. If there is any disparity in the degree of "action level" enforcement, complaint should first be made to the director as the responsible principal.

The judgment is affirmed; the parties to bear their own costs on appeal.

Best, J., and Brown (G. A.), J.,* concurred.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.