[No. C037502. Third Dist. June 27, 2002.]

WESTERN STATES PETROLEUM ASSOCIATION et al., Plaintiffs and Appellants, v.
STATE DEPARTMENT OF HEALTH SERVICES, Defendant and Respondent.

1000

COUNSEL

Mayer, Brown & Platt, Gregory R. McClintock and Michael F. Kerr for Plaintiff and Appellant Western States Petroleum Association.

Fred Main for Plaintiff and Appellant California Chamber of Commerce.

Bill Lockyer, Attorney General, Thomas R. Yanger and Mateo Munoz, Deputy Attorneys General, for Defendant and Respondent.

Miller, Sher & Sawyer, Duane C. Miller, Victor M. Sher and A. Curtis Sawyer for South Tahoe Public Utility District and City of Santa Monica as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**SCOTLAND, P. J.**—Pursuant to the California Safe Drinking Water Act (Health & Saf. Code, § 116270 et seq.), defendant state Department of Health Services (the Department) has the responsibility of establishing primary drinking water standards that include the maximum levels of contaminants which, in the Department's judgment, may have an adverse effect on the health of persons. (Health & Saf. Code, §§ 116275, subd. (b), 116365; further section references are to this code unless otherwise specified.) The Department has discretionary authority to set secondary drinking water standards that relate to the effect of a contaminant upon the taste, odor, and appearance of water. (§ 116275, subd. (d).) However, in 1997, the Legislature required, among other things, that on or before July 1, 1998, the Department had to adopt secondary drinking water standards for methyl tertiary-butyl ether, commonly known as MTBE. (§ 116610, subd. (b); Stats. 1997, ch. 814, § 11; Stats. 1997, ch. 815, § 3.)

The Department adopted a secondary drinking water standard for MTBE by regulation. (Cal. Code Regs., tit. 22, § 64449.) Plaintiffs Western States Petroleum Association and the California Chamber of Commerce unsuccessfully challenged the regulation by complaint for declaratory relief and petition for writ of mandate.

On appeal, plaintiffs contend that the Department and the trial court misconstrued the relevant legislation and that the secondary drinking water standard established by the Department is arbitrary and capricious. We disagree. As we will explain, the standard is consistent with the statutory scheme, which gives the Department broad authority to determine the level of contamination that meets the criteria for a secondary drinking water standard for MTBE, and the standard is supported by substantial evidence. Accordingly, we shall affirm the judgment.[1]

---

[1]The South Tahoe Public Utility District and the City of Santa Monica, who have appeared as amici curiae in support of the standard adopted by the Department, ask us to take judicial notice of certain materials, including the federal Environmental Protection Agency's (EPA) notice of intent to initiate rulemaking that would eliminate or limit the use of MTBE in gasoline; the University of California's report to the Governor on the health and environmental risks and benefits of MTBE; the Governor's Executive Order No. D-5-99; policy state-

## BACKGROUND

In the federal Clean Air Act of 1990, Congress mandated that reformulated gasoline be used in geographic areas with excessive ozone and smog levels. Reformulated gasoline is made by the addition of an oxygenate to increase oxygen levels in the gasoline. An increased oxygen content in gasoline promotes more complete burning and thereby serves to reduce carbon monoxide and ozone levels in the air. The primary oxygenates used in reformulated gasoline are MTBE and ethanol, with MTBE being used in about 84 percent of reformulated gasoline supplies.

MTBE is a petroleum derivative that has been described as a colorless liquid hydrocarbon. It has a small molecular size and is readily soluble in water. As a result, MTBE is highly mobile in soils and can migrate into groundwater more readily than other constituents of gasoline. It biodegrades slowly, if at all.

After MTBE came into regular use as a gasoline additive, it began showing up in drinking water supplies. Among other things, this caused the federal EPA to issue a drinking water advisory. At that time, there were limited studies on the potential health effects of MTBE exposure and no studies on the effects on humans of long-term exposure to MTBE. The EPA recommended that drinking water levels be kept at or below 20 to 40 micrograms per liter ($\mu$g/L). One $\mu$g/L is equal to .001 milligrams per liter (mg/L) and is approximately equal to one part per billion (ppb).

In 1997, the Legislature became concerned about MTBE contamination. Among other things, the Legislature enacted the MTBE Public Health and Environmental Protection Act of 1997. (Stats. 1997, ch. 816, § 1.) In an uncodified portion of that act, the Legislature appropriated $500,000 to the University of California to conduct an independent study and assessment of the human health and environmental risks and benefits, if any, associated with the use of MTBE. (Stats. 1997, ch. 816, § 3.) The Legislature directed the university to submit a draft report to the Governor on or before January 1, 1999. (Stats. 1997, ch. 816, § 3, subd. (d).) The Governor was required to submit the draft report for comments from the United States Geological Survey and the Agency for Toxic Substances and Disease Registry at the Centers for Disease Control, and to hold two public hearings. On the basis of the draft report, the comments, and the testimony at the public hearings, the

---

ments and resolutions by the Department and by the State Water Resources Control Board; and the federal EPA's antidegradation regulation (40 C.F.R. § 131.12 (2001)). These are matters of which judicial notice may be taken and we grant the request. (Evid. Code, § 452, subd. (c).)

Governor was required to certify that, on balance, there either is or is not a significant risk to human health or the environment from using MTBE in gasoline in this state. (Stats. 1997, ch. 816, § 3(d)-(f).) If there is such a risk, the Governor was directed to take appropriate action, which could include banning the use of MTBE in gasoline. (Stats. 1997, ch. 816, §§ 3(f), 4.)[2]

At the same time that the Legislature took action to provide for an independent study of the health and environmental effects of MTBE use, it enacted two other measures with respect to MTBE. (Stats. 1997, chs. 814, 815.) Of concern in this litigation is the addition of section 116610, known as the Local Drinking Water Protection Act, to the Safe Drinking Water Act. (Stats. 1997, ch. 814, § 11; Stats. 1997, ch. 815, § 3.) Subdivision (c) of section 116610 required that on January 1, 1998, the Department commence the process for adopting a primary drinking water standard for MTBE, and that it adopt such a standard on or before July 1, 1999. Primary drinking water standards are concerned with a contaminant's potential to have an adverse effect on the health of persons. (§ 116275, subd. (c)(1).) The Department eventually set the primary drinking water standard for MTBE at 13 μg/L. (Cal. Code Regs., tit. 22, § 64444.) No issue is presented in this case with respect to the Department's determination of a primary drinking water standard concerning MTBE.

In subdivision (d) of section 116610, the Legislature stated: "On or before July 1, 1998, the State Department of Health Services shall adopt a secondary drinking water standard that complies with the criteria established under subdivision (d) of Section 116275 and that does not exceed a consumer acceptance level for MTBE." Section 116275, subdivision (d) states: " 'Secondary drinking water standards' means standards that specify maximum contaminant levels that, in the judgment of the department, are necessary to protect the public welfare. Secondary drinking water standards may apply to any contaminant in drinking water that may adversely affect the odor or appearance of the water and may cause a substantial number of persons served by the public water system to discontinue its use, or that may otherwise adversely affect the public welfare. Regulations establishing secondary drinking water standards may vary according to geographic and other

---

[2]As a result of this process, the Governor issued Executive Order No. D-5-99, which certified that the use of MTBE in gasoline poses a significant risk to the environment. The order directed various state agencies and officials to take certain actions, including those that eventually will eliminate the use of MTBE in California gasoline supplies. A state ban on the use of MTBE will not eliminate the federal requirement of the use of reformulated gasoline. Thus, unless federal regulators act on the matter, alternative oxygenates, such as ethyl tertiary-butyl ether (ETBE), tertiary amyl methyl ether (TAME), or ethanol, will be required. (See Stats. 1997, ch. 816, § 2.)

circumstances and may apply to any contaminant in drinking water that adversely affects the taste, odor, or appearance of the water when the standards are necessary to assure a supply of pure, wholesome, and potable water."

The determination whether to establish a secondary drinking water standard is, for the most part, discretionary with the Department; and the Department has set secondary standards with respect to relatively few contaminants. (Cf. Cal. Code Regs., tit. 22, §§ 64444, 64449.) By declaration in the trial court, the Department stated section 116610, subdivision (d) is the only instance in which the Legislature has required the establishment of a secondary drinking water standard for a specific contaminant. The Department perceives this to be indicative of the extent of the concern of the Legislature and the public with respect to MTBE contamination of drinking water.

Pursuant to the Department's regulatory scheme, exceeding a secondary maximum contaminant level is a trigger for further action. If a secondary standard is exceeded, the Department must investigate to determine the extent of noncompliance and the level of consumer dissatisfaction based upon the secondary standard. (Cal. Code Regs., tit. 22, § 64449, subd. (d).) The Department can require the water supplier to conduct a further study of the degree of consumer acceptance of the water supply, the causes and methods of correction, and the cost of alternative solutions. (*Ibid.*) After investigation, the Department can waive compliance based upon such things as consumer acceptance of the water supply and economic considerations. (Cal. Code Regs., tit. 22, § 64449, subd. (e).)

In 1998, the Department began the process of establishing a secondary drinking water standard with respect to MTBE. The Department proposed to establish a secondary maximum contaminant level of 5 μg/L for MTBE. After publishing notice of its intended action, the Department received written comments from a number of persons and entities, both in support of and opposition to the establishment of the proposed secondary drinking water standard. The Department made written responses to the comments and noted that no one had requested a public hearing on the matter. At the conclusion of the regulatory process, the Department adopted the 5 μg/L standard.

DISCUSSION

I

Before addressing plaintiffs' specific contentions, it is appropriate to discuss the applicable standards of judicial review. In this respect, we

must be cognizant that the administrative action under challenge is the establishment of maximum contaminant levels applicable to drinking water. Such an action is of a legislative, rather than adjudicative, nature (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 567 [38 Cal.Rptr.2d 139, 888 P.2d 1268]), and the appropriate scope of review must be "firmly rooted in that consideration." (*Dawson v. Town of Los Altos Hills* (1976) 16 Cal.3d 676, 685 [129 Cal.Rptr. 97, 547 P.2d 1377].)

Plaintiffs make two related and overlapping contentions. First, they assert that the standard established by the Department is inconsistent with the Department's statutory authority. Second, they claim that the standard is arbitrary, capricious, and lacking in evidentiary support. The first contention requires consideration of the extent of the authority delegated to the Department by the Legislature. The second contention requires consideration of the factual and policy bases upon which the Department acted.

■ With respect to the first contention, plaintiffs correctly point out that an administrative agency cannot enlarge or exceed the scope of authority that has been statutorily delegated to it. (*Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1480 [277 Cal.Rptr. 481].) They also correctly point out that the interpretation of a statute is a judicial duty, in the performance of which courts must exercise independent judgment. (*Sanchez v. Unemployment Ins. Appeals Bd.* (1977) 20 Cal.3d 55, 67 [141 Cal.Rptr. 146, 569 P.2d 740].) However, it does not follow that we will accord no significance to the Department's view of its statutory authority. An administrative agency's construction of the authority vested in the agency to carry out a statutory provision is entitled to great weight and will be followed unless it is clearly erroneous or unauthorized. (*Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668 [150 Cal.Rptr. 250, 586 P.2d 564]; *Wilkinson v. Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 491, 501 [138 Cal.Rptr. 696, 564 P.2d 848].) This standard does not shift from the judiciary the ultimate responsibility for construing the applicable statutory provisions; but it does mean that, in the process, the agency's construction must be given appropriate consideration. (*International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 931, fn. 7 [163 Cal.Rptr. 782, 609 P.2d 1].)

■ In this litigation, there is no question that the Department had authority to adopt a secondary drinking water standard for MTBE; in fact, it was required to do so by express legislative directive. ■ Instead, plaintiffs' dissatisfaction is with the Department's determination of the appropriate level at which the standard should be set. That necessarily involved a

determination and weighing of the facts and policy considerations appropriate to the decision. This is a distinctively legislative process, and a court does not have the authority to exercise its independent judgment with respect to the performance of legislative functions. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; *Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1015 [9 Cal.Rptr.2d 358, 831 P.2d 798].)

It follows that we will not, in the guise of a challenge to the Department's statutory authority, venture into an independent determination of the wisdom of the challenged regulation. (*Moore v. California State Bd. of Accountancy, supra,* 2 Cal.4th at p. 1015; *Pitts v. Perluss* (1962) 58 Cal.2d 824, 833-834 [27 Cal.Rptr. 19, 377 P.2d 83]; *Californians for Safe Prescriptions v. California State Bd. of Pharmacy* (1993) 19 Cal.App.4th 1136, 1150 [23 Cal.Rptr.2d 755].) Thus, in considering the consistency of the challenged regulation with the authorizing statute, we will not substitute our judgment for that of the agency with respect to such things as the existence and weight to be accorded the facts and policy considerations that support the regulation. Rather, we limit our review to a determination of whether the Department reasonably interpreted its legislative mandate. (*California for Safe Prescriptions,* at p. 1150.)

Plaintiffs' second contention calls into question the Department's determination and weighing of the facts and policy considerations relevant to the regulatory standard. In this respect, the regulation comes before us with a strong presumption of validity. (*Moore v. California State Bd. of Accountancy, supra,* 2 Cal.4th at p. 1015; *Bell v. Board of Supervisors* (1994) 23 Cal.App.4th 1695, 1710 [28 Cal.Rptr.2d 919].) The party challenging the regulation has the burden of demonstrating its invalidity. (*Bell v. Board of Supervisors, supra,* 23 Cal.App.4th at p. 1710.) In order to do so, it must demonstrate that the regulation is arbitrary and capricious. (*Moore v. California State Bd. of Accountancy, supra,* 2 Cal.4th at p. 1015; *Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687].)

With these standards of review in mind, we proceed to the consideration of plaintiffs' specific contentions.

## II

Plaintiffs contend that the 5 µg/L maximum contaminant level established as a secondary drinking water standard is inconsistent with the Department's statutory authority. They reason that, in addition to requiring a

standard which does not exceed a consumer acceptance level for MTBE, section 116610, subdivision (d) requires the Department to comply with the criteria of section 116275, subdivision (d). Section 116275, subdivision (d) provides, among other things, that a secondary drinking water standard may apply to any contaminant that "may adversely affect the odor or appearance of the water and may cause a substantial number of persons served by the public water system to discontinue its use."

In plaintiffs' view, the possibility that a substantial number of persons will discontinue use of a water supply is the pivotal and determinative factor under section 116275, subdivision (d). They argue that, in applying this factor, the Department cannot set a standard that is below "the highest level at which most consumers will not find the odor or taste of the water to be objectionable." Since, in plaintiffs' view, the 5 µg/L standard is below this level, they conclude that the standard is inconsistent with the Department's statutory authority and thus invalid.

We reject plaintiffs' conclusion and the reasoning by which they reach it. The argument invites us to reweigh the various factual and policy considerations that went into the Department's determination. As we have noted, the Department's performance of its quasi-legislative duties and the wisdom of its action can be reviewed only pursuant to an arbitrary and capricious standard. In considering plaintiffs' claim that the regulation is beyond the Department's statutory authority, a claim to which we apply our independent judgment, we will focus upon the applicable statutes and the authority they reasonably confer upon the Department. In this light, our reasoning is as follows:

The Safe Drinking Water Act and the Local Drinking Water Protection Act are remedial acts intended to protect the public from contamination in its drinking water. Hence, we are required to construe the statutes broadly to accomplish their protective purposes. (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313-314 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) In these acts, the Legislature delegated to the Department the initial and primary authority, and the corresponding responsibility, for establishing drinking water standards. (§§ 116270, subd. (g), 116275, subds. (c) & (d); see also § 116610 subds. (c) & (d).) Courts must respect this primary delegation of authority. (*Hampson v. Superior Court* (1977) 67 Cal.App.3d 472, 484 [136 Cal.Rptr. 722].)

It is in this light that the Legislature enacted section 116610, subdivision (d). In doing so, the Legislature accomplished several things. First, it

removed all discretion from the Department in the determination of whether a secondary drinking water standard should be adopted for MTBE. By enacting section 116610, subdivision (d), the Legislature decided such a standard is necessary. Simply stated, administrative agencies and courts are not at liberty to second-guess the Legislature's determination in that regard.

Second, the Legislature required that a secondary drinking water standard be established for MTBE in a reasonably prompt manner. Section 116610 became effective on January 1, 1998, and the Legislature required the Department to act on or before July 1, 1998.

Third, the Legislature directed the Department to apply the criteria of section 116275, subdivision (d). In doing so, the Legislature placed only one restriction on the discretionary authority conferred upon the Department by subdivision (d) of section 116275, i.e., that the standard set "does not exceed a consumer acceptance level for MTBE." (§ 116610, subd. (d).) By its plain language, this qualification on the Department's discretion does not require the Department to set a secondary standard at a level of consumer acceptance, or at any particular level. It limits the Department's discretion only by describing a maximum level above which the standard may not be set. Thus, in determining whether the Department set a standard at a level lower than is statutorily acceptable, our primary reference must be to section 116275, subdivision (d).

The plain terms of section 116275, subdivision (d) confer broad discretion on the Department, i.e., " 'Secondary drinking water standards' means standards that specify maximum contaminant levels that, *in the judgment of the department*, are necessary to protect the public welfare." (Italics added.) The Department is expressly accorded the authority to consider any factor that may adversely affect the public welfare, specifically including the possibility that the presence of a contaminant "may adversely affect the odor or appearance of the water and may cause a substantial number of persons served by the public water system to discontinue its use."[3] These are the factors that the Department purports to consider in setting secondary maximum contaminant levels. (See Cal. Code Regs., tit. 22, § 64449, subd. (a).)

---

[3] In this regard, section 116275, subdivision (d) more fully states: "Secondary drinking water standards may apply to any contaminant in drinking water that may adversely affect the odor or appearance of the water and may cause a substantial number of persons served by the public water system to discontinue its use, or that may otherwise adversely affect the public welfare. Regulations establishing secondary drinking water standards may vary according to geographic and other circumstances and may apply to any contaminant in drinking water that adversely affects the taste, odor, or appearance of the water when the standards are necessary to assure a supply of pure, wholesome, and potable water."

Section 116275, subdivision (d) leaves it to the Department, in the exercise of its discretion and expertise, to determine such things as the level at which a contaminant may adversely affect the odor and appearance of water, the level at which a contaminant may cause a substantial number of persons to discontinue use of a water supply, and, for that matter, what a substantial number of persons is within the context of the law. The law does not provide specific limitations upon the Department's exercise of discretion in these respects.

As we have noted, in the Department's regulatory scheme, secondary maximum contaminant levels serve as presumptive or "trigger" levels of contamination. At or below those levels, further action is not required. If those levels are exceeded, investigation and consideration specific to the particular water supply is required. (Cal. Code Regs., tit. 22, § 64449, subds. (d)-(e).) The Department can waive compliance with secondary maximum contaminant levels based upon such things as consumer acceptance of the specific water supply and economic considerations. (*Ibid.*) This regulatory scheme is consistent with the Department's authority in section 116275, subdivision (d), which provides that secondary standards can vary according to geographic and other circumstances. And it reasonably supports setting secondary maximum contaminant levels to trigger further particularized consideration before substantial numbers of consumers actually discontinue use of a water supply. (See *Freeman v. Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408-409 [95 Cal.Rptr. 852] ["the state need not wait until the public safety has actually suffered injury" before taking reasonable action to protect the public water supply from contamination].)

Plaintiffs' primary basis for arguing that the 5 μg/L standard is legally unacceptable centers on the concept of "a substantial number of persons." (§ 116275, subd. (d).) Plaintiffs equate "substantial" with a preponderance and argue the standard cannot be set below a level that is the highest level at which most consumers will not find the odor or taste of contaminated water objectionable.

While "substantial" is a word of common use in law, it is not a word of constant referent. Whether something is substantial must be determined by reference to the particular nature of the inquiry. For example, as a reviewing court, we apply the substantial evidence rule to a claim that the evidence is insufficient to support the judgment. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631 [85 Cal.Rptr.2d 386].) In this respect, substantial is not equated with the preponderance or the weight of the evidence; rather, substantial evidence may be slight in comparison to the contradictory evidence so long as it is of ponderable legal significance. (*Ibid.*) Similarly, to be

considered a substantial factor in the cause of an injury, a force may be very minor so long as it is not negligible, theoretical, or infinitesimal. (*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71, 79 [86 Cal.Rptr.2d 846, 980 P.2d 398].) Thus, it is established that, depending upon the relevant circumstances and the nature of the inquiry, a fairly small portion of a whole may be considered substantial. (*Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 48-49 [6 Cal.Rptr.2d 602] [3 percent of outstanding stock was substantial in view of the plaintiff's stated goal of acquiring all of the stock].) The determination of whether something is "substantial" is generally a question of fact that turns on the circumstances and nature of the particular inquiry. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 938 [55 Cal.Rptr.2d 724, 920 P.2d 669]; *Schreidel v. American Honda Motor Co.* (1995) 34 Cal.App.4th 1242, 1250 [40 Cal.Rptr.2d 576].)

In determining what is a "substantial number of persons" within the meaning of section 116275, subdivision (d), it is appropriate to consider the findings and declarations of the Legislature in enacting the Safe Drinking Water Act. These declarations include: "Every citizen of California has the right to pure and safe drinking water." (§ 116270, subd. (a).) The Legislature also has declared: "This chapter is intended to ensure that the water delivered by public water systems of this state shall at all times be pure, wholesome, and potable. This chapter provides the means to accomplish this objective." (§ 116270, subd. (e).)

These declarations set forth legislative objectives and do not themselves establish drinking water standards. (*Paredes v. County of Fresno* (1988) 203 Cal.App.3d 1, 12 [249 Cal.Rptr. 593].) However, the drinking water standards established by the Department must take these objectives into account. In view of them, the Department was warranted in concluding that, to be "substantial" within the meaning of section 116275, subdivision (d), the number of persons who might discontinue use of a water supply need not be a preponderance, nor even a large portion of the consumers served by the supplier. It is sufficient that the number be significant, i.e., more than negligible or infinitesimal.

In sum, the Legislature delegated broad authority to the Department to determine the level of contamination that should be established as a secondary drinking water standard for MTBE. If the level set by the Department is not arbitrary and capricious, it is not inconsistent with the Department's statutory authority. (*Pitts v. Perluss, supra,* 58 Cal.2d at pp. 833-835.) Accordingly, we will proceed to the consideration of plaintiffs' claim that the standard is arbitrary and capricious.

### III

In proposing to set a secondary drinking water standard for MTBE at 5 µg/L, the Department noted two studies. The first, by a research team headed by W. F. Young, is referred to as the Young study. The Young study was intended to determine detection levels for a broad variety of contaminants of water. It utilized small panels of all female assessors who were regarded as having above average sensitivities to basic tastes and odors. With respect to MTBE, the lowest concentration of odor detection was at 15 µg/L, at which level one-third of the panel (three of nine) detected the contaminant.[4] In reporting the results, the study said: "It must be stressed that there is a considerable margin of error associated with the lowest threshold concentrations since the dilution intervals are of factors of about 2.5."[5]

The second study noted by the Department was conducted by a team headed by Yvonne F. Shen for the Orange County Water District and which is referred to as the Shen study or the Orange County study. The Shen study utilized small panels (eight to ten persons) of experienced assessors to determine detection levels for the odor of MTBE in water. Tests were run utilizing odor-free water, chlorinated city water, and water that contained free residual chlorine. The test runs included water at room temperature, at 40 degrees centigrade, and at 60 degrees centigrade. The results were reported as a range of detection with the geometric mean of detection.[6] The reported results do not reflect how many panelists could identify MTBE at particular levels; but they do indicate that in 7 of the 16 test runs at least some panelists could discern MTBE contamination at levels of 2.5 µg/L, and that in 11 of the 16 test runs at least some panelists could discern MTBE contamination at levels of 5 µg/L or below.

---

[4]The Young study assessed both taste and odor and concluded that odor has a lower threshold detection level than taste. On the other hand, studies by the Metropolitan Water District of Southern California and the American Petroleum Institute concluded that taste has a lower detection level than odor. Some of the available studies focused solely on odor detection in view of the lack of a definitive health standard for the ingestion of MTBE. With respect to the taste versus odor detection question, the Young study reported that it is often difficult for a consumer to distinguish between taste and odor and that what is reported as a taste complaint is often more likely an odor problem.

[5]Plaintiffs assert that the Young study found that none of the subjects could detect the odor of MTBE in water at levels below 15 µg/L. But that is not what the Young study found. In view of the large dilution intervals employed in the Young study, the next lower level tested after 15 µg/L was at the 5 or 6 µg/L level. The Young study reflects that its subjects began to be able to detect MTBE in water at some point between 5 or 6 µg/L and 15 µg/L, and that at 15 µg/L one-third of the panel could detect MTBE.

[6]The geometric mean is the level that divides the test panel in half. In other words, one-half of the test panel could identify MTBE in the test water at levels at or below the geometric mean, and one-half of the panel could not identify MTBE in the test water until it reached a level at or above the geometric mean.

During the comment period, other studies were noted, in particular a study conducted by Malcolm Pirnie, Inc., for the Oxygenated Fuels Association, Inc. That study utilized a panel of 57 persons who were subjected to 8 test runs of concentrations ranging from 2 to 100 ppb, the equivalent of 2 µg/L to 100 µg/L. The study employed a "triangle test" methodology, i.e., in each test run, the subjects were given three samples with one being odd either because it contained MTBE and the other two did not, or because it did not contain MTBE and the other two did. The subjects were required to choose (or guess) the odd sample.

The recorded results of the Malcolm Pirnie testing provide information of relevance to our inquiry. By the nature of the triangle test, it would be expected that, on average, one-third of the subjects (19 persons) would correctly select the odd sample by random chance at any particular contaminant level. In fact, at every level tested in the Malcolm Pirnie study, a significantly higher proportion of the panel correctly identified the odd sample. For example, at 2 ppb, 25 subjects (almost 44 percent of the panel) were correct. At 3.5 ppb, 28 subjects (over 49 percent of the panel) were correct. At 6 ppb, the nearest level to the Department's proposed standard, 35 subjects (over 61 percent of the panel) were correct. That these were not mere variations in random chance is also indicated by the study. Of the 25 persons who were correct at the 2 ppb level, 10 correctly identified the odd sample at every level tested. Of the 35 who were correct at the 6 ppb level, 18 went on to correctly identify the odd sample at every subsequent level.[7]

Together, these factors constitute compelling evidence that, at a contamination level of 5 µg/L, or perhaps even below, a significant number of consumers will be able to detect the presence of MTBE in water supplies.

Plaintiffs argue that the 5 µg/L standard is inappropriate because, in their view, the taste and odor of MTBE in water does not become objectionable until it reaches much higher concentrations. Some of the available studies have attempted to obtain descriptions of the taste and odor of MTBE in water. In the Young study, the most common descriptors of the odor of MTBE in water were "[e]stery, vanilla, sweet" and the most common descriptors of taste were "[e]stery, bitter." In a study commissioned by the

---

[7]Plaintiffs urged the Department to set the secondary standard at 15 µg/L, the equivalent of 15 ppb. The Malcolm Pirnie study did not conduct a test run at 15 ppb, but it did conduct tests at 10 and 18 ppb. At 10 ppb, 34 panelists (almost 60 percent of the panel) correctly identified the odd sample and 22 of them (almost 39 percent of the panel) correctly identified the odd sample at every subsequent level. At 18 ppb, 38 panelists (a full two-thirds of the panel) correctly identified the odd sample and 31 of them (almost 55 percent of the panel) were correct at every subsequent level.

American Petroleum Institute, a panel of six or seven persons described the taste of MTBE in water as " 'nasty,' bitter, nauseating, and similar to rubbing alcohol."[8] In a study by the Metropolitan Water District of Southern California, four persons were asked to describe the taste and odor of MTBE in water. At concentrations of 2 to 5 µg/L, the panel said the taste could be described as sweet; at higher levels, the taste was described as solvent or sweet solvent. The study indicates the panelists considered the taste to be objectionable at approximately 50 µg/L and the odor objectionable at approximately 90 to 100 µg/L.

Plaintiffs argue that, because descriptions of the odor and/or taste of MTBE in water at low concentrations are not phrased in harsh terms, and because the four-member panel in the Metropolitan Water District study did not describe the taste and odor of MTBE as objectionable at low levels, the Department was precluded from establishing a low level secondary drinking water standard. However, pure, wholesome, and potable water—which is the Legislature's declared objective for drinking water (§ 116270, subds. (a) & (e))—is supposed to be colorless, odorless, and tasteless. The Department said that, in its experience, consumers find any indication of a contaminant in drinking water to be highly objectionable. We agree with the Department that it was not required to presume consumers will find acceptable a contaminant that imparts a taste or odor to drinking water simply because the taste or odor is not described in terms of revulsion.

And, in setting the secondary drinking water standard, the Department was entitled to consider a number of other factors reflected in the record. The studies indicate that sensitivity to detection of contaminants in water varies widely between individuals and may vary with respect to an individual from day to day. The studies also indicate that the detectability of MTBE in water will vary with respect to such things as the temperature of the water and the manner of its presentation to the consumer. In day-to-day life, consumers use tap water for a wide variety of purposes, and the Department reasonably could conclude that, in these daily activities, drinking water supplies will be used often in a manner that maximizes the detectability of MTBE contamination.

The studies also indicate other constituents of a water supply might influence the effect of MTBE in water. Some constituents, such as chlorine, might mask the MTBE and make it harder to detect. Other constituents, such

---

[8]The American Petroleum Institute study calculated threshold detection levels that were relatively high in comparison to other studies and thus it is likely that the descriptors given there were based upon relatively high levels of contamination.

as other forms of contamination, might exacerbate the effect of MTBE. While pure water is an objective of the state, statutory and regulatory standards do not require that water be entirely pure; and few, if any, water supplies are entirely clear of a broad range of contaminants. (See Cal. Code Regs., tit. 22, §§ 64444, 64449, 64450.) Thus, the Department reasonably could conclude that, in actual water supplies, MTBE contamination will not exist in isolation from other forms of contaminants and that, while within legally acceptable levels, those contaminants may exacerbate the effect of MTBE.

Plaintiffs place reliance on the drinking water advisory issued by the EPA. Therein, the EPA said "it seems reasonable to offer a range of 20-40 µg/L as advisory guidance for helping to ensure consumer acceptance of the taste and odor of MTBE in drinking water."[9] Plaintiffs complain that the Department "gave the EPA guidance short shrift." We are not persuaded.

In enacting the Safe Drinking Water Act, the Legislature said: "It is the intent of the Legislature to improve laws governing drinking water quality, to improve upon the minimum requirements of the federal Safe Drinking Water Act Amendments of 1996, to establish primary drinking water standards that are at least as stringent as those established under the federal Safe Drinking Water Act, and to establish a program under this chapter that is more protective of public health than the minimum federal requirements." (§ 116270, subd. (f).) In accordance with these legislative declarations, we conclude that (1) the Department is not bound by federal standards and in particular is not bound by a mere federal advisory, and (2) the Department would abuse its discretion and act in a manner inconsistent with its statutory responsibilities if it adopted a federal standard without exercising its independent judgment to determine whether the standard is appropriate for California.

Plaintiffs complain that the Department did not consider economic factors in setting the secondary drinking water standard for MTBE. In fact, the Department did address economic considerations, but it employed reasoning and reached conclusions contrary to plaintiffs' views.

With respect to the effect of economic considerations on establishment of a secondary drinking water standard for MTBE, the Department's discretion was constrained.

---

[9]The EPA also said: "It is not possible to identify point threshold values for the taste and odor of MTBE in drinking water, as the concentration will vary for different individuals, for the same individuals at different times, for different populations, and for different water matrices, temperatures, and many other variables." However, the EPA recognized that, in the general population, some unknown percentage of persons would detect MTBE in drinking water at much lower concentrations than 20 µg/L.

First, the Legislature already had determined that, despite any adverse economic considerations, a secondary drinking water standard for MTBE is necessary. (§ 116610, subd. (d).) Accordingly, any economic consequences that would arise simply from the adoption of a standard for MTBE are beyond the Department's purview.

Second, plaintiffs urged the Department to adopt a secondary drinking water standard based upon a preponderance standard, i.e., one that would protect most consumers from adverse taste and odor in their drinking water. The Department determined, correctly, that a preponderance standard would not be sufficient and that a secondary drinking water standard for MTBE that exposed a substantial number of consumers to adverse taste and odor would not comply with the legislative directive in sections 116275, subdivision (d) and 116610, subdivision (d). The Department determined, based upon substantial evidence, that the standard proposed by plaintiffs would not comply with the legislative mandate. Having made such a determination, the Department was not at liberty to use economic considerations to avoid complying with the legislative mandate.

In this light, the only discretion left to the Department was to determine whether some level of contamination higher than the 5 µg/L that it proposed, but lower than the 15 µg/L that it found to be insufficient, might meet the minimum requirements of sections 116275, subdivision (d) and 116610, subdivision (d), while avoiding significant economic consequences of the 5 µg/L standard. The Department said it did consider alternate levels but determined that no other level would feasibly meet the statutory objectives. The Department also considered the claim of secondary costs, such as the cost of remediating polluted sites and discharge requirements which might be issued by regional or local water boards, to be speculative. Under the circumstances, the Department did not abuse its discretion in this respect.

In summary, by enacting section 116610, subdivision (d), the Legislature required the Department to set a secondary drinking water standard for MTBE and required the standard to meet the criteria of section 116275, subdivision (d) and not exceed a level of consumer acceptance. Within these restrictions, the Department was vested with broad discretion to determine the appropriate standard. The Department correctly determined that a standard which might protect most consumers but which would still leave substantial numbers of persons exposed to adverse taste or odor in their drinking water would not comply with section 116275, subdivision (d). Based upon substantial evidence, the Department determined that 5 µg/L is the appropriate standard for MTBE. Plaintiffs would draw different conclusions from the evidence and would weigh various considerations differently.

However, to successfully challenge the Department's action it is not enough to show that the record would have supported a different result; rather, it must be demonstrated that the Department's decision was so lacking in evidentiary and legal support as to be arbitrary and capricious. We agree with the trial court that the Department's action was not arbitrary and capricious.

DISPOSITION

The judgment is affirmed.

Raye, J., and Callahan, J., concurred.